**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

            v.

AZIZ F. AWAD,
            *Defendant-Appellant.*

No. 06-50578

D.C. No.
CR-04-00237-JVS-1

OPINION

Appeal from the United States District Court
for the Central District of California
James V. Selna, District Judge, Presiding

Argued and Submitted
November 18, 2008—Pasadena, California

Filed January 12, 2009

Before: Susan P. Graber and Richard R. Clifton,
Circuit Judges, and Edward C. Reed, Jr.,* District Judge.

Opinion by Judge Graber

---

*The Honorable Edward C. Reed, Jr., Senior United States District
Judge for the District of Nevada, sitting by designation.

357

## COUNSEL

Charles M. Sevilla, San Diego, California, for the defendant-appellant.

Douglas F. McCormick, Assistant United States Attorney, Santa Ana, California, for the plaintiff-appellee.

## OPINION

GRABER, Circuit Judge:

Defendant Dr. Aziz F. Awad stands convicted of 24 counts of participating in a scheme to defraud Medicare under 18 U.S.C. § 1347 and four counts of money laundering involving the proceeds of health care fraud under 18 U.S.C. § 1956(a)(1)(A). He alleges four errors that we address here: (1) omission of the word "willfully" from the portion of the indictment alleging violations of 18 U.S.C. § 1347; (2) a multiplicitous indictment; (3) jury instructions stating that the jury need not find that Defendant knew his conduct was unlawful; and (4) application of a sentencing enhancement under U.S.S.G. § 2B1.1(b)(12)(A) (2005) for creating a risk of serious bodily injury or death.[1] For the reasons explained below, we affirm.

---

[1]Defendant also argues that several of the district court's other jury instructions, evidentiary rulings, and expert witness rulings were erroneous. On those issues, we agree with the district court's reasoning and conclusions and, therefore, affirm. *Tilcock v. Budge*, 538 F.3d 1138, 1143 (9th Cir. 2008), *petition for cert. filed*, ___ U.S.L.W. ___ (U.S. Oct. 31, 2008) (No. 08-7077); *Hoefler v. Babbitt*, 139 F.3d 726, 729 (9th Cir. 1998).

## FACTUAL AND PROCEDURAL HISTORY

### A.  *Medicare Reimbursement*

Testimony at trial explained the procedures through which physicians are reimbursed for services rendered to Medicare-insured patients. Medicare provides insurance coverage for persons over age 65 and for certain disabled persons. Physicians must apply to provide services to Medicare beneficiaries. In order to be accepted, physicians must follow Medicare's rules and regulations, submit accurate claims, and accept Medicare's payment for services rendered. The Medicare Carriers Manual is a compilation of Medicare's interpretation of its rules and regulations for payment of claims. Medicare also sends physicians newsletters that contain billing information, guidelines, rules, and regulations.

To obtain payment from Medicare for services rendered to a beneficiary, a provider submits a claim form. The claim form requires the provider to list a provider number, a procedure code, and a place-of-service ("POS") code. The physician must certify on the claim form that "the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision, except as otherwise expressly permitted by Medicare or [applicable] regulations." Each claim form also provides that "[a]ny person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under the law and may be subject to civil penalties."

When someone other than a physician performs the service for which Medicare is billed, certain supervision requirements must be satisfied. The requisite level of supervision depends on the place where the medical visit occurs. If the services are performed outside the physician's office setting, non-

physician's services are covered as "incident to" the physician's service only if there is "direct personal supervision" by the physician. When services are provided in an institution such as a convalescent home, the availability of the physician by telephone, or even the presence of the physician somewhere else in the building, does not constitute direct personal supervision.

Medicare regulations provide POS codes that show the type of location where a service is performed. The physician is responsible for choosing the POS code that is most appropriate. A service provided in the physician's office is coded "11," while a service provided in a "board-and-care facility" is coded "33." Medicare does not pay physicians for respiratory treatments given in board-and-care facilities—that is, respiratory treatments denoted with POS code 33—even if they are directly supervised by the doctor.

### B.   *The Fraudulent Scheme*

Defendant owned Active Care Medical Group and became a Medicare provider in 1996. In early 2000, Defendant met with co-defendant Herman Thomas, who owned a billing company and a respiratory therapy company, to discuss providing respiratory services to board-and-care facilities.[2] Defendant's medical practice was struggling financially at the time. Thomas told Defendant that Defendant's role in the respiratory treatment program would be to evaluate patients and supervise therapists. Thomas, who is not a physician, said that he would take primary responsibility for providing the therapists and for doing the billing.

Defendant and Thomas hired marketers to find board-and-care facilities where Defendant could evaluate patients for respiratory problems. Most of the facilities that participated

---

[2]Thomas and Defendant were tried jointly. Both were convicted of 24 counts of health care fraud and four counts of money laundering.

housed mentally ill patients who had Medicare or Medi-Cal insurance. Defendant began seeing Medicare and Medi-Cal patients at various board-and-care facilities in March 2000. Defendant performed initial assessments on those patients to determine whether they needed respiratory treatment. One of Defendant's therapists testified that Defendant ordered respiratory therapy for "about 100%" of the patients he saw.

In late 2000, the California Department of Health Services conducted an audit of Defendant's Medi-Cal billings. The audit showed that some services that were billed were not actually rendered; that the documentation provided did not establish medical necessity for the services billed; that documentation on patients was "predetermined and preprinted," and therefore not "patient-specific"; and that respiratory treatments were not being rendered in accordance with Medi-Cal policy. Defendant received a letter cataloguing these deficiencies dated July 3, 2001. The letter notified Defendant that he had been placed on "special claims review," meaning that he had to submit billing forms in hard copy so that a claims examiner could review them personally before any payment was issued. After receiving that letter, Defendant stopped submitting claims to Medi-Cal.

Medicare also began an audit of Defendant's billings after receiving a patient complaint that services billed had not been rendered. The investigative report showed that Defendant was seeing up to 114 patients per date of service, based on the number of claims submitted. There were numerous occasions on which 90 or more patients were seen on one day, according to billing records. In a sample of 35 patient files, Defendant billed for six patients whom he allegedly treated at board-and-care facilities, when the patients were hospitalized elsewhere on the dates claimed. Defendant also consistently used POS code 11, which is reserved for office visits, for treatments provided at board-and-care facilities. Defendant's billing for a certain respiratory treatment was 14 times the number, and 18,000 times the amount, than that of the next highest biller

in Southern California for that same type of treatment. For another treatment, Defendant billed 28 times the number and 42,000 times the amount of the next highest biller. A follow-up investigation revealed that Defendant billed Medicare for more than $460,000 for treatments performed by his therapists while he was out of the country.

From 2000 to 2003, Defendant billed Medicare approximately $7.4 million for respiratory treatments. Medicare allowed $2,561,819 of those billings and, from January 2000 to September 2003, Medicare paid claims of $2,035,968. Medi-Cal suffered a loss attributable to Defendant of $589,754.

As a result of these activities, Defendant was charged with 24 counts of participating in a scheme to defraud Medicare under 18 U.S.C. § 1347 and with four counts of conducting monetary transactions involving the proceeds of health care fraud under 18 U.S.C. § 1956(a)(1)(A). The case proceeded to trial. At the close of evidence, Defendant moved for a judgment of acquittal, asserting, among other arguments, that the indictment against him was insufficient because it did not use the word "willfully" with respect to the health care fraud allegations. The district court took the motion under submission. The jury found Defendant guilty of all 24 counts of health care fraud and all four counts of conducting monetary transactions involving the proceeds of health care fraud. After the verdict, Defendant renewed his motion, and the court denied it. Defendant was sentenced to 180 months' imprisonment; three years' supervised release; restitution in the amount of $2,625,722; and a $2,800 special assessment. This timely appeal followed.

## DISCUSSION

Defendant asserts on appeal that the indictment was insufficient; that the indictment was multiplicitous; that the jury instructions erroneously stated that the jury need not find that

Defendant knew his actions were unlawful and that the error was prejudicial; and that the two-level sentencing enhancement for creating a risk of serious bodily injury or death should not apply. We address each argument in turn.

## A.    *Sufficiency of the Indictment*

**[1]** We review de novo the sufficiency of an indictment. *United States v. Alber*, 56 F.3d 1106, 1111 (9th Cir. 1995). An indictment must be a "plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). An indictment is sufficient if it contains "the elements of the charged crime in adequate detail to inform the defendant of the charge and to enable him to plead double jeopardy." *Alber*, 56 F.3d at 1111 (internal quotation marks omitted). The test for sufficiency of the indictment is "not whether it could have been framed in a more satisfactory manner, but whether it conforms to minimal constitutional standards." *United States v. Hinton*, 222 F.3d 664, 672 (9th Cir. 2000).

**[2]** Section 1347 states in part: "Whoever knowingly *and willfully* executes, or attempts to execute, a scheme or artifice to defraud any health care benefit program . . . shall be fined under this title or imprisoned not more than 10 years, or both." 18 U.S.C. § 1347(1) (emphasis added). The indictment in this case for counts 1 through 24 alleged that, between January 2000 and September 2003, within the Central District of California, Defendant and Thomas "knowingly and with the intent to defraud, devised, executed, and participated in a scheme to defraud Medicare." Defendant argues that the omission of the word "willfully" from the indictment renders it insufficient and that, as a result, counts 1 through 24 must be dismissed.[3]

---

[3]Counts 25 through 28 charge violations of 18 U.S.C. § 1956(a)(1)(A), which requires only that the person "knowingly," but not "willfully," conduct transactions using the monetary proceeds of fraud. The indictment for counts 25 through 28 alleged that Defendant "knowingly and willfully" conducted monetary transactions involving the proceeds of health care fraud. This portion of the indictment is not challenged.

**[3]** An indictment must be read in its entirety and construed with "common sense and practicality." *Alber*, 56 F.3d at 1111. In *Alber*, the defendant challenged an indictment that failed to allege that he acted with the "intent to extort." *Id.* at 1112. We held that the indictment had set forth the essential facts with sufficient specificity to infer intent. *Id.* The court reasoned that a threatening letter described in the indictment amounted to "per se extortion," and "[c]ommon sense would tell any reader that the letter was sent with the intent to extort." *Id.*

**[4]** Similarly, here, an inference of willfulness is obvious because of the facts alleged in the indictment. The United States Supreme Court has held that, in the criminal context, a "willful" act is "one undertaken with a 'bad purpose.'" *Bryan v. United States*, 524 U.S. 184, 191 (1998). In the present case, although the word "willfully" does not appear in the indictment, sufficient facts were pleaded so that any reader would infer that Defendant acted with a bad purpose.

**[5]** The indictment alleged that Defendant directed respiratory therapists to create medical records showing that they had performed respiratory treatments when such treatments were not actually performed, and that Defendant billed Medicare for such treatments even though they did not occur. The indictment further alleged that, "[i]n carrying out the fraudulent scheme, acting with intent to defraud and deceive," Defendant communicated false statements in Medicare billings. It alleged that Defendant knew that such statements were false and that the acts described in the indictment were "fraudulent, unlawful, and deceptive." The indictment described seven specific kinds of acts that Defendant allegedly knew were fraudulent.[4] Finally, the indictment provided

---

[4]The indictment alleged that Defendant knew the following:

   (a)   that Defendant was neither providing, nor supervising[,] the Respiratory Treatments being billed to Medicare; (b) that the

that, in carrying out the scheme, "acting with intent to defraud and deceive," Defendant concealed facts from Medicare about his "fraudulent business practices regarding the delivery of and payment for the Respiratory Treatments."

[6] When construed with "common sense and practicality," as *Alber* requires, the indictment as a whole conveyed that Defendant acted "with a 'bad purpose.' " *Bryan*, 524 U.S. at 191. *Hinton* directs that the question is not whether the indictment could have been framed in a more satisfactory manner, but whether it meets minimum constitutional standards. 222 F.3d at 672. Omission of the word "willfully" was not fatal, as the indictment sufficiently informed Defendant of the charges against him because of the nature and specificity of the facts alleged.

[7] Defendant responds by citing *United States v. Du Bo*, 186 F.3d 1177, 1179 (9th Cir. 1999). *Du Bo* held that if an indictment completely fails to recite an essential element of a charged offense and the insufficiency is properly challenged before trial, the omission is "not a minor or technical flaw subject to harmless error analysis, but a fatal flaw requiring dismissal of the indictment." *Id.* That case addressed an indictment that failed to allege the requisite mental state of "knowingly or willingly." *Id.* The indictment alleged only that the defendant "unlawfully" affected commerce by the

---

Respiratory Treatments being billed to Medicare were not being provided in Defendant's medical office in Anaheim; (c) that Medicare does not pay for the Respiratory Treatments if such treatments are performed on patients at residential board and care facilities; (d) that Medicare does not pay for the Respiratory Treatments which are not provided and directly supervised by a physician; (e) that Medicare does not pay for the Respiratory Treatments if such treatments are provided by unlicensed individuals; (f) that Medicare does not pay for the Respiratory Treatments if such treatments are not provided; and (g) that Medicare does not pay for the Respiratory Treatments if billing for such treatments are based upon falsified and forged medical records.

" 'wrongful' use of force," an allegation that, standing alone, was insufficient. *Id.*

**[8]** *Du Bo* does not apply here for two reasons. First, Defendant challenged the indictment during trial, not before trial as in *Du Bo*. We cautioned in *Du Bo* that our holding was "limited to cases where a defendant's challenge is timely." *Id.* at 1180 n.3. When, as in the present case, a defendant's challenge is not brought before trial, the indictment is "liberally construed" because the defendant had an opportunity to resolve any ambiguity in the indictment through a pre-trial motion. *See United States v. Chesney*, 10 F.3d 641, 642-43 (9th Cir. 1993) (holding that a challenge brought at the close of the government's case was untimely and that the indictment would therefore be afforded a liberal construction).

**[9]** Second, the indictment here did not completely fail to recite an essential element of the charge. A "liberal" and "common sense" reading of the indictment signals unmistakably that Defendant acted with a bad purpose, which is the Supreme Court's definition of "willfully." *Bryan*, 524 U.S. at 191-92. Although the detailed factual allegations may not be a full substitute for the word "willfully," the government did not completely fail to allege that Defendant acted with an improper purpose. We therefore reject Defendant's challenge to the indictment.

B.  *Multiplicity*

Whether an indictment is multiplicitous is generally reviewed de novo. *United States v. Vargas-Castillo*, 329 F.3d 715, 718-19 (9th Cir. 2003). Here, however, because Defendant did not raise the argument below, we review only for plain error. *United States v. Olano*, 507 U.S. 725, 730 (1993); Fed. R. Crim. P. 52(b).

Defendant argues that the 24 counts of health care fraud (or all but one of them) should be dismissed because they are

multiplicitous. He characterizes the government's indictment as charging 24 acts in furtherance of a single scheme, rather than 24 separate executions of a scheme to defraud Medicare.

**[10]** An indictment is multiplicitous if it charges a single offense in more than one count. *United States v. Garlick*, 240 F.3d 789, 793-94 (9th Cir. 2001). "The test for multiplicity is whether each count 'requires proof of a[n additional] fact which the other does not.' " *Id.* at 794 (quoting *Blockburger v. United States*, 284 U.S. 299, 304 (1932) (wording alteration added by *Garlick*)).

**[11]** We find persuasive the reasoning of *United States v. Hickman*, 331 F.3d 439, 445-47 (5th Cir. 2003), which held that each fraudulent claim submitted to Medicare could form the basis of a separate count. The health care fraud statute punishes one who "knowingly and willfully executes, or attempts to execute" a scheme to defraud Medicare. 18 U.S.C. § 1347. *Hickman* reasoned that, because the health care fraud statute's text and structure are "almost identical" to the bank fraud statute's text and structure,[5] and the Fifth Circuit had interpreted the bank fraud statute as criminalizing each execution of a scheme to defraud, the health care fraud statute, by analogy, likewise punishes each execution of a scheme to defraud. 331 F.3d at 445-46. The *Hickman* court also concluded that each submission of a fraudulent claim to Medicare constituted an "execution" of the scheme to defraud because, with each submission, the defendant owed a "new, independent obligation to be truthful to the insurer." *Id.* at 447.

**[12]** We, too, have held in the context of bank fraud that each execution of the scheme to defraud may be charged as a separate count. *See United States v. Molinaro*, 11 F.3d 853,

---

[5]The bank fraud statute reads, in pertinent part: "Whoever knowingly executes, or attempts to execute, a scheme or artifice . . . to defraud a financial institution . . . shall be fined . . . or imprisoned . . . ." 18 U.S.C. § 1344(1).

860 (9th Cir. 1993) (each execution of the scheme to defraud is a separate count of bank fraud). We now extend the same rule to health care fraud.

**[13]** Each submission of a fraudulent claim to a health care benefit program, rather than being simply an act in furtherance of a larger scheme to defraud, is a separate execution of the scheme and is itself chargeable as a separate count. Here, Defendant owed a new and independent obligation to be truthful each time he submitted one of the 24 fraudulent claims included in the indictment. Each claim carried a new form on which Defendant acknowledged his obligation to convey complete and truthful information. Each claim was independently paid by Medicare, and each exposed Medicare to financial loss. Each of the 24 counts required proof of an additional element that the other counts did not require: that the information in that specific claim, as distinct from the other claims, was false. Therefore, the indictment charging 24 counts of health care fraud was not multiplicitous.

C. *Jury Instructions Regarding Willfulness*

We review de novo whether jury instructions accurately define the elements of a statutory offense. *United States v. Hicks*, 217 F.3d 1038, 1045 (9th Cir. 2000). If a jury instruction misstates an element of a statutory crime, the error is harmless if it is "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *Neder v. United States*, 527 U.S. 1, 18 (1999); *see also United States v. Henderson*, 243 F.3d 1168, 1171 (9th Cir. 2001).

Defendant argues that the jury instructions were erroneous because they stated that the government did not have to prove that Defendant knew his conduct was unlawful. Because the district court's instructions told the jury exactly the opposite of the Supreme Court's definition of "willfully," the instruc-

tions were erroneous. For the reasons explained below, however, the error was harmless beyond a reasonable doubt.

The jury was instructed in part:

> Defendants are charged in Counts 1 through 24 of the Indictment with health care fraud in violation of Section 1347 of Title 18 of the United States Code.
>
> . . . .
>
> In order for a defendant to be found guilty of health care fraud based upon a scheme to defraud, the government must prove four elements beyond a reasonable doubt:
>
> First, the defendant knowingly and willfully devised or participated in a scheme to defraud a health care benefit program;
>
> Second, the statements made or facts omitted as part of the scheme were material;
>
> Third, the defendant acted with intent to defraud; and
>
> Fourth, the scheme involved the delivery of or payment for health care benefits, items or services.
>
> . . . .
>
> For purposes of proving health care fraud, an act is done knowingly if the defendant is aware of the act and does not act through ignorance, mistake, or accident. *The government is not required to prove that the defendant knew that his acts or omissions were unlawful.*

. . . .

> For purposes of health care fraud, a person acts "willfully," as that term is used in these instructions, when that person acts deliberately, voluntarily, and intentionally.

(Emphasis added.) Defendant argues that the emphasized portion of the instructions is wrong because it contradicts the statutory requirement that he had to have acted "willfully."

The Supreme Court has recognized that "willfully" is a "word of many meanings" whose construction often depends on the context in which it appears. *Bryan*, 524 U.S. at 191. Generally, in the criminal context, a "willful" act is one undertaken with a "bad purpose." *Id.* The *Bryan* Court went on to state that, "in order to establish a 'willful' violation of a statute, '*the Government must prove that the defendant acted with knowledge that his conduct was unlawful.*' " *Id.* at 191-92 (emphasis added) (quoting *Ratzlaf v. United States*, 510 U.S. 135, 137 (1994)). The Court noted that one part of the jury instructions given in *Bryan*, which is identical in meaning to an instruction given in this case, misstated the law. In that part of the instructions, the judge had stated that the government was not "required to prove that [the defendant] had knowledge that he was breaking the law." *Id.* at 199. That statement, standing alone, "contained a misstatement of the law," *id.*, given the rule that in order to establish a willful act the government *must* prove that the defendant knew that his or her conduct was unlawful, *id.* at 191-92.

**[14]** Relying on *Bryan*, we held in *Henderson* that the district court's failure to give a "general instruction that 'willfully' means that [a defendant] knew his [or her] conduct was unlawful" was in error. *Henderson*, 243 F.3d at 1173 (emphasis omitted). In *Henderson*, the defendant was convicted of violating a regulation governing the occupancy of public lands. *Id.* at 1170. The statute enforcing the regulation pro-

vided that "[a]ny person who knowingly and willfully" violates the regulation would be punished. *Id.* at 1171. The magistrate judge rejected the defendant's request to instruct the jury that willfulness requires "the specific intent to do or fail to do what [the defendant] knows is unlawful." *Id.* at 1170. Instead, the judge instructed the jury only that "[t]he word 'willfully' means that a person knowingly and intentionally committed the acts which constitute the offenses charged." *Id.* We held that the instructions were erroneous, noting that *Bryan* required the prosecution to establish that the defendant was aware that the conduct in question was unlawful. *Id.* at 1171-73.

But we went on to hold that the error in the judge's instructions was harmless beyond a reasonable doubt. *Id.* at 1173. The defendant had received a "Notice of Immediate Suspension" informing him that he was in violation of the regulation and that he had five days to comply. *Id.* We held that, once the defendant received the notice informing him that he was violating the regulation, he was aware that his conduct was unlawful. *Id.* at 1174. Therefore, even if the jury had been instructed that it had to find that the defendant knew his conduct was unlawful, that element undoubtedly would have been met. *Id.* In our view, "[n]o reasonable jury could have found that [the d]efendant lacked knowledge that his conduct was unlawful after the date he received the written Notice." *Id.* As a result, the magistrate judge's failure to give the defendant's requested instruction was harmless error. *Id.*

**[15]** We reach the same conclusion here. There was an error in the district judge's willfulness instructions. The instruction that "[t]he government is not required to prove that the defendant knew that his acts or omissions were unlawful" was erroneous under *Bryan*, 524 U.S. at 199.

**[16]** Nonetheless, the error was harmless beyond a reasonable doubt for three reasons. First, the certification on each claim that Defendant submitted to Medicare informed him

that submitting "any false, incomplete or misleading information" could subject him to criminal liability and punishment—that is, the certifications themselves stated that such submissions were unlawful. It is undisputed that Defendant signed these certifications, either physically or electronically, when he submitted each of the fraudulent claims. By submitting claims for treatments that either were not performed at all or that ran afoul of Medicare's supervision requirements, Defendant knew that he was committing an unlawful act that exposed him to criminal liability. He also received notification from Medi-Cal and Medicare, alerting him to problems with his claims. The fact that he stopped submitting Medi-Cal claims as soon as he was notified that his claims would be subject to heightened review, because an audit revealed billing problems, shows his guilty knowledge.

**[17]** Second, the instructions on health care fraud informed the jury that the government was required to prove that Defendant acted with an "intent to defraud." An "intent to defraud" was defined as "an intent to deceive or cheat." We must presume that the jury followed those instructions. *Richardson v. Marsh*, 481 U.S. 200, 206 (1987). In order to have found Defendant guilty, the jury necessarily found that Defendant acted with the purpose of deceiving or cheating Medicare. No reasonable jury could have found that a physician intended to deceive or cheat the Federal Government but did not know that such conduct is unlawful, especially in light of the warnings on the claim forms.

Other jury instructions also support our conclusion. The money laundering instruction informed the jury that the "government must prove that the defendant knew that the funds transferred represented the proceeds of unlawful conduct, violation of the health care fraud statute." A guilty verdict on the money laundering counts means that the jury found that Defendant knew the actions which produced the money transferred were unlawful. Moreover, the jury was instructed that a good faith belief that the acts were lawful was a complete

defense "because good faith on the part of the defendant is, simply, inconsistent with a finding of an intent to defraud." By finding Defendant guilty, the jury necessarily rejected the argument that Defendant acted with a good faith belief that his acts were lawful.

**[18]** Third, the fraudulent scheme was, for the most part, so bold and simple that no reasonable person could have thought it lawful. For example, Defendant billed for services not rendered—in common parlance, theft. Defendant moved from financial struggle to more than $2 million in paid claims over a period of about three years. His billings were wildly out of line with other physician's billings: With respect to one treatment, he billed 28 times the number and 42,000 times the amount of the next highest biller in Southern California. And he and his co-schemer consciously selected a vulnerable population that was unlikely to alert authorities.

**[19]** In short, Defendant carried out a brazen scheme to collect millions of dollars under obviously false pretenses, which no reasonable jury could have found to be lacking in willfulness. Therefore, although the district court's jury instructions on willfulness contained an error, that error was harmless beyond a reasonable doubt.

D. *Sentencing Enhancement for Risk of Serious Bodily Injury or Death*

Finally, Defendant challenges the two-level sentencing enhancement that the district court applied for conduct involving "conscious or reckless risk of death or serious bodily injury." U.S.S.G. § 2B1.1(b)(12)(A) (2005). The court found that Defendant's failure to supervise treatments posed a risk of serious bodily injury to the patients. The court reasoned that "[m]ost if not all of the respiratory therapy administered was not required. The treatments included inhalation of medications. Medicare required that a treating provider be present in the facility where the treatment was given. This fact is indica-

tive that the treatment carried some risk that the provider's immediate attention might be needed. [Defendant] was present for none of the treatments, thus placing each patient in risk."

The district court's interpretation and application of the Sentencing Guidelines are reviewed de novo. *United States v. Blitz*, 151 F.3d 1002, 1009 (9th Cir. 1998). But we review for clear error the court's factual findings. *Id.*

**[20]** Defendant argues that the respiratory therapies at issue were basic, non-invasive procedures that posed no risk of injury, serious or otherwise, to patients. He notes that no patients reported adverse side effects from the treatments. Nonetheless, it is only the "creation of risk, not the infliction of injury," that is required for application of this enhancement. *United States v. W. Coast Aluminum Heat Treating Co.*, 265 F.3d 986, 993 (9th Cir. 2001). The government argues that Defendant's failure to supervise the treatments posed a risk because an adverse reaction to a treatment or medication could result in death or serious bodily injury. At trial, a therapist who worked with Defendant testified that she believed Defendant should have been present at all the treatments because of the risk of adverse side effects.

**[21]** The sentencing enhancement for creating a risk of serious bodily injury or death may not be proper in every prosecution for health care fraud, which is designed to punish financial fraud, rather than to enforce standards of medical care. But, in this case, there was evidence that a consistent failure to supervise jeopardized patients. In light of our deferential standard of review, we cannot say that the district court clearly erred in finding that Defendant's conduct posed a risk of serious bodily injury or death, even if we would not have made the same finding. We therefore reject Defendant's challenge to the sentencing enhancement.

AFFIRMED.