**NOT RECOMMENDED FOR PUBLICATION**
File Name: 20a0013n.06

**Nos. 17-1987 / 2032**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED**<br>Jan 09, 2020<br>DEBORAH S. HUNT, Clerk |
| | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE WESTERN |
| DAVID SOSA-BALADRON (17-1987) and | ) | DISTRICT OF MICHIGAN |
| BELKIS SOCA-FERNANDEZ (17-2032), | ) | |
| | ) | |
| Defendants-Appellants. | ) | |
| | ) | |

**BEFORE: COLE, Chief Judge; BOGGS and GIBBONS, Circuit Judges.**

**JULIA SMITH GIBBONS, Circuit Judge.** David Sosa-Baladron and Belkis Soca-Fernandez were convicted of health care fraud, mail fraud, and conspiracy to commit mail fraud. Their scheme involved opening massage therapy clinics, staging car accidents, and submitting false claims for services to insurance companies. On appeal, Sosa-Baladron and Soca-Fernandez challenge their convictions based on the sufficiency of evidence, constructive amendments, and evidentiary rulings. They also appeal the district court's decision to impose three sentence enhancements. Because their arguments lack merit, we affirm.

I.

In 2012, Sosa-Baladron and Soca-Fernandez came to Michigan to open massage therapy clinics. Their business plan involved billing insurance companies for treatments the clinics did

not provide. Patients often staged accidents and injuries in return for payment by the clinics' owners and operators.

In April 2012, Soca-Fernandez and Sosa-Baladron opened their first clinic, Revive Therapy Center, LLC ("Revive"), in the city of Wyoming, Michigan, along with Antonio Martinez-Lopez. Martinez-Lopez served as Revive's manager, while Soca-Fernandez and Sosa-Baladron purported to be its "investors." Soca-Fernandez hired Dolis Rojas-Lopez to refer people who had automobile accidents—"real or unreal"—to Revive. DE 365, Trial Tr. Vol. II, Page ID 2531–32. Rojas-Lopez then started recruiting people to participate in fake accidents and offering them cash.

Martinez-Lopez, Soca-Fernandez, and Sosa-Baladron met with Dr. Flor Borrero, a local pediatrician, to convince her to see "patients" from Revive, indicating that their clinic was serving the low-income Hispanic community in Wyoming. Dr. Borrero agreed, and Martinez-Lopez began bringing patients to see her. Dr. Borrero saw many patients who had not suffered real injuries but had instead participated in staged car accidents. Rojas-Lopez had recruited these patients, and Soca-Fernandez and Martinez-Lopez coached them on the symptoms they should report to Dr. Borrero. After obtaining a prescription from Dr. Borrero for physical therapy, the participants signed blank therapy treatment forms that later were filled in to overstate the treatment received at Revive. Generally, patients received very little physical therapy treatment or no treatment at all, yet Revive billed insurance companies for treatments and services it did not provide. "Patients" would typically be paid between one and two thousand dollars for their participation in the fraud.

In May 2012, Sosa-Baladron and Martinez-Lopez interviewed and hired Revive's first massage therapist, Martha Zavala, who was then trained by Soca-Fernandez. On Soca-Fernandez's instructions, Zavala had patients sign blank forms and filled them out for treatment services she never actually performed. In May 2013, Yoisler Herrera-Enriquez joined Revive as

a massage therapist. Herrera-Enriquez similarly began filling out already-signed therapy forms for treatment services he did not provide, and Soca-Fernandez used the forms to falsely bill insurance companies. Sosa-Baladron observed the false billings. While working at Revive, Herrera-Enriquez learned that Martinez-Lopez, Soca-Fernandez, and Sosa-Baladron "shared the money of the business." DE 365, Trial Tr. Vol. II, Page ID 2373. And while running Revive, Sosa-Baladron, Soca-Fernandez, Martinez-Lopez, and Rojas-Lopez organized numerous staged accidents.

Martinez-Lopez's friend Gustavo Acuna-Rosa became involved in the fraud scheme at Revive, first as an accident participant and patient. Later, Acuna-Rosa, Martinez-Lopez, and Soca-Fernandez discussed opening another clinic, and Acuna-Rosa officially opened Renue Therapy Center, LLC ("Renue") in Lansing, Michigan in May 2013.

Renue used the same scheme as Revive—staging car accidents and fraudulently billing insurers for treatment that was never provided. Renue also sent its "patients" to Dr. Borrero for physical therapy prescriptions. Soca-Fernandez hired Herrera-Enriquez from Revive to join Renue as a massage therapist and to sign forms for treatment services he never performed. Sosa-Baladron and Soca-Fernandez, along with two other recruited participants, staged their own accident and submitted false billings for services from Renue.

In August 2013, Herrera-Enriquez opened H&H Rehab Center, LLC ("H&H") in Wyoming, Michigan, down the street from Revive. H&H operated under the same system as Revive and Renue: Martinez-Lopez and Rojas-Lopez recruited participants, the participants staged car accidents, and Dr. Borrero ordered therapy treatment. Some of these participants staged accidents and signed fraudulent therapy forms for both H&H and Revive.

In March 2014, Maria Sanchez-Jimenez, a confidential informant, became a Renue patient after being recruited by Rojas-Lopez. Sanchez-Jimenez gave a false accident report to Rojas-Lopez, who coached her on reporting false symptoms. After meeting with Dr. Borrero, Sanchez-Jimenez met with Acuna-Rosa and Martinez-Lopez to sign blank Renue therapy forms, which were then submitted to an insurance company for payment, even though Sanchez-Jimenez never received any treatment. Sanchez-Jimenez later signed blank treatment forms for H&H after being told that Acuna-Rosa had shut down Renue Therapy. H&H submitted Sanchez-Jimenez's fraudulent therapy treatment bills.

Members of this scheme were first indicted in the Western District of Michigan in March 2016. Over the next several months, more individuals were indicted, many of whom entered into plea agreements. Finally, in February 2017, a grand jury charged Sosa-Baladron and Soca-Fernandez with conspiracy to commit mail fraud in violation of 18 U.S.C. § 1349 (Count 1), health-care fraud in violation of 18 U.S.C. § 1347 (Counts 2–5, 7–13), and mail fraud in violation of 18 U.S.C. § 1341 (Counts 14–17, 19, 21).[1] After a seven-day trial, the jury found both defendants guilty on all counts.

The district court sentenced Sosa-Baladron to 120 months' imprisonment and Soca-Fernandez to 135 months' imprisonment. Sosa-Baladron and Soca-Fernandez filed timely notices of appeal, and their appeals were consolidated.

---

[1] Sosa-Baladron and Soca-Fernandez were tried jointly with Martinez-Lopez, who faced related mail-fraud and wire-fraud charges and an additional charge of unlawful procurement of naturalization (Count 22). The jury found Martinez-Lopez guilty and the district court sentenced him to 87 months' imprisonment. Martinez-Lopez appealed separately, and we affirmed his conviction and sentence. *See United States v. Martinez-Lopez*, 747 F. App'x 326 (6th Cir. 2018).

II.

*Sufficiency of the Evidence.* Sosa-Baladron challenges his convictions for mail fraud and health care fraud based on the sufficiency of the evidence and argues that the district court erred in denying his motion for judgment of acquittal under Fed. R. Crim. P. 29. We review *de novo* the district court's denial of a motion for judgment of acquittal based on insufficient evidence. *United States v. Graham*, 622 F.3d 445, 448 (6th Cir. 2010). We must affirm if the evidence, viewed in the light most favorable to the government, would allow any rational trier of fact to find Sosa-Baladron guilty beyond a reasonable doubt. *See United States v. Carmichael*, 232 F.3d 510, 519 (6th Cir. 2000).

The government proceeded on an aiding-and-abetting theory at trial with regard to the mail-fraud and health-care-fraud counts, and the district court instructed the jury accordingly. Sosa-Baladron therefore need not have "personally committed the crime" to be convicted, but rather it was sufficient if he "intentionally helped [or encouraged] someone else to commit the [fraud]." Sixth Circuit Pattern Jury Instruction 4.01 (first brackets in original); *see also* 18 U.S.C. § 2(a) ("Whoever . . . aids, abets, counsels, commands, induces or procures [the commission of an offense], is punishable as a principal."). Thus, the district court properly denied Sosa-Baladron's Rule 29 motion if the evidence sufficiently demonstrated that Sosa-Baladron intentionally assisted the individuals who carried out the criminal acts giving rise to those counts and sought by his actions to make the scheme to defraud succeed.

To prove mail fraud under 18 U.S.C. § 1341, the government must show that (1) the defendant knowingly participated in or devised a scheme to defraud in order to obtain money; (2) the scheme included material misrepresentations or concealment of a material fact; (3) the defendant had the intent to defraud; and (4) the defendant used the mail or caused another to use

the mail in furtherance of the scheme. Sixth Circuit Pattern Jury Instruction 10.01; *see also United States v. Frost*, 125 F.3d 346, 354 (6th Cir. 1997).

To prove health-care fraud under 18 U.S.C. § 1347, the government must show that (1) the defendant knowingly and willfully executed a scheme to defraud a health-care benefit program or to obtain its money or property by fraudulent pretenses, representations, or promises; (2) the scheme related to or included a material misrepresentation or concealment of material fact; and (3) the defendant had the intent to defraud. Sixth Circuit Pattern Jury Instruction 10.05; *see also United States v. Hunt*, 521 F.3d 636, 645 (6th Cir. 2008).

### A.

Four counts (Counts 2, 4, 14, and 16) stemmed from a staged accident in October 2012 involving Ana Hidalgo and Lorena Aguilar. Hidalgo and Aguilar testified that Rojas-Lopez recruited them to sit in Hidalgo's car while Rojas-Lopez hit it from behind. Martinez-Lopez took Hidalgo and Aguilar to Dr. Borrero after coaching them on what symptoms to report. Revive subsequently billed insurance companies for treatment it did not provide. During this process, Aguilar met Soca-Fernandez and Sosa-Baladron. Aguilar and Hidalgo were paid for their participation in the scheme.

Two counts (5 and 17) relate to a January 2013 staged accident involving Alex Watters. Watters testified that he met with Martinez-Lopez, who informed Watters that he needed insurance and that the staged accident must involve enough damage to justify a police report. Watters intentionally drove off an icy road and hit a tree. Revive then billed Watters's insurance company for massage therapy services Watters did not receive. Watters and two other participants in the accident were each paid $1,000.

Two counts (9 and 19) pertain to a November 2013 staged automobile accident involving Soca-Fernandez, Sosa-Baladron, and passengers Yosvany Gonzalez and Eduardo Pardo-Oiz. Gonzalez and Pardo-Oiz testified that Sosa-Baladron purposely drove his vehicle off the roadway and then instructed them to report false symptoms to Dr. Borrero. A massage therapist at Renue testified that he never treated Soca-Fernandez or Sosa-Baladron, yet the clinic submitted false bills to the insurer for his treatment of them.

Five counts (10, 11, 12, 13, and 21) all relate to the government's confidential informant, Sanchez-Jimenez. As discussed above, Rojas-Lopez recruited Sanchez-Jimenez to participate in the fraud scheme, after which Sanchez-Jimenez saw Dr. Borrero and signed blank treatment forms for both Renue and H&H. Both Renue and H&H submitted false billings to Sanchez-Jimenez's insurance company.

The evidence shows that the individuals running these clinics knowingly devised and executed a scheme to defraud health insurance companies to obtain money and made material misrepresentations in the billings sent via U.S. mail, in violation of 18 U.S.C. §§ 1341 and 1347. On this evidence, a reasonable juror could infer that Sosa-Baladron had the specific intent to defraud the insurance companies and was an accomplice to mail fraud and health-care fraud. The government presented sufficient evidence that Sosa-Baladron aided and abetted Rojas-Lopez, Martinez-Lopez, and other co-conspirators in the scheme to submit fraudulent claims to the insurance companies—based on the staged accidents described above—in order to obtain money. As the owner and investor in the clinics falsely billing insurers via U.S. mailings, Sosa-Baladron "participate[d] in [the scheme] as in something that he wishe[d] to bring about, . . . [and] s[ought] by his action to make it succeed." *Nye & Nissen v. United States*, 336 U.S. 613, 619 (1949). Even

if Sosa-Baladron did not sign the insurance billings or seal the envelopes, the evidence demonstrates that Sosa-Baladron assisted in the success of the scheme to defraud.

Thus, because a rational trier of fact could have found Sosa-Baladron guilty on these charges beyond a reasonable doubt, the district court did not err in denying Sosa-Baladron's Rule 29 motion.

III.

*Multiple Conspiracies.* Soca-Fernandez and Sosa-Baladron both argue that the proof at trial demonstrated the existence of two conspiracies rather than one. They challenge their conspiracy convictions under different legal theories. Sosa-Baladron argues that the district court erred in refusing to instruct the jury on multiple conspiracies. Soca-Fernandez, on the other hand, contends that there was an impermissible constructive amendment to or fatal variance from the indictment, which charged one count of conspiracy to commit mail fraud. Both Sosa-Baladron and Soca-Fernandez's claims require analyzing whether the proof at trial demonstrated multiple conspiracies and, if so, whether the defendants were prejudiced by jury instructions that failed to mitigate the evidence of multiple conspiracies. We therefore address whether the combination of trial evidence and jury instructions created a constructive amendment or fatal variance, which are different types of modifications to an indictment. *See United States v. Kuehne*, 547 F.3d 667, 683 (6th Cir. 2008). We review a claim of constructive amendment or variance *de novo*. *United States v. Mize*, 814 F.3d 401, 408 (6th Cir. 2016).

"A constructive amendment 'results when the terms of an indictment are in effect altered by the presentation of evidence and jury instructions which so modify essential elements of the offense charged such that there is a substantial likelihood that the defendant may have been convicted of an offense other than the one charged in the indictment." *Id.* at 409 (quoting *United*

*States v. Martinez*, 430 F.3d 317, 338 (6th Cir. 2005)). A constructive amendment is *per se* prejudicial and requires reversal of the defendant's conviction. *Kuehne*, 547 F.3d at 683.

A variance, on the other hand, results "when the charging terms [of the indictment] are unchanged, but the evidence at trial proves facts materially different from those alleged in the indictment." *Id.* (alteration in original) (quoting *United States v. Prince*, 214 F.3d 740, 756–57 (6th Cir. 2000)). To be fatal, a variance must also affect a substantial right of the defendant. *Kuehne*, 547 F.3d at 683. "The substantial rights of the defendant 'are affected only when the defendant shows prejudice to his ability to defend himself at trial, to the general fairness of the trial, or to the indictment's sufficiency to bar subsequent prosecutions.'" *Id.* (quoting *United States v. Hynes*, 467 F.3d 951, 962 (6th Cir. 2006)). Thus, a defendant may succeed in getting his conviction reversed based on a variance only where he also proves prejudice.

Here, the defendants cannot establish a constructive amendment or a fatal variance.

### A. Constructive Amendment

Count 1 of the indictment charged Soca-Fernandez, Sosa-Baladron, and their partner, Martinez-Lopez, with conspiracy to commit mail fraud by staging car accidents, opening therapy clinics, and mailing fraudulent claims for therapy services to car insurance companies. On appeal, the defendants argue that the government presented evidence of two conspiracies: one conspiracy involving Revive and Renue and another conspiracy involving H&H. Because the district court denied their request to instruct the jury on two separate conspiracies, Soca-Fernandez and Sosa-Baladron claim the court constructively amended the indictment as to Count 1.

The Supreme Court has long held that the charges in an indictment may not be broadened through the presentation of evidence at trial. *Stirone v. United States*, 361 U.S. 212, 218–19 (1960). When a district court allows a defendant to be convicted on a charge the grand jury never

made, it commits fatal error. *Id.* at 219. On the other hand, the presentation of evidence that narrows the scheme alleged in the indictment does not violate the Fifth Amendment guarantee of indictment by a grand jury. *United States v. Miller*, 471 U.S. 130, 134–35 (1985). As long as the proof at trial corresponds to an offense clearly charged in the indictment, a conviction for such offense and based upon that proof should be sustained. *Id.* at 136. Thus, only when the proof at trial *broadens* the scope of an alleged conspiracy or scheme beyond that charged in the indictment—unmitigated by jury instructions—does a constructive amendment result. *See Mize*, 814 F.3d at 410–411.

In *Mize*, we found that the government's proof at trial focused predominantly on an uncharged conspiracy and, in doing so, broadened the scope of the indictment and altered its terms. *Id.* at 409–10. There was no constructive amendment, however, because the district court instructed the jury on multiple conspiracies. *Id.* at 409. Soca-Fernandez relies on *Mize* for the proposition that the evidence of two conspiracies, without mitigating jury instructions, constitutes a constructive amendment when only one is charged. Her argument is misguided. Here, the government presented evidence that all three clinics engaged in one conspiracy to commit mail fraud as charged in the indictment: the clinics involved overlapping management and recruiters, used the same law firm, employed the same scheme, and targeted the same participants. Unlike in *Mize*, the government's proof here did not broaden the conspiracy. The government's proof of the fraudulent scheme and false mailings from Revive, Renue, and H&H did not so alter the terms of the indictment as to create a substantial likelihood that Soca-Fernandez and Sosa-Baladron may have been convicted of an uncharged offense. Therefore, the district court did not err in refusing to give a mitigating jury instruction, and no constructive amendment to Count 1 of the indictment occurred.

B. Variance

Even if no constructive amendment occurred, a defendant may still prevail if he can prove that the evidence presented at trial amounted to a variance and that the variance prejudiced him. *Kuehne*, 547 F.3d at 683. In the conspiracy context, proof of a fatal variance requires a showing that the "indictment allege[d] one conspiracy, but the evidence can reasonably be construed *only* as supporting a finding of multiple conspiracies." *United States v. Caver*, 470 F.3d 220, 235–36 (6th Cir. 2006) (alteration in original) (quoting *United States v. Warner*, 690 F.2d 545, 548 (6th Cir. 1982)). Thus, to succeed on this theory, Soca-Fernandez and Sosa-Baladron must show that the *only* reasonable conclusion based on the evidence was that two separate conspiracies existed and that they were prejudiced by such variance from the indictment.

In determining whether a single conspiracy existed, the court considers three factors: (1) "the existence of a common goal," (2) "the nature of the scheme," and (3) "the overlapping of the participants in various dealings." *United States v. Smith*, 320 F.3d 647, 652 (6th Cir. 2003). "A single conspiracy is not converted to multiple conspiracies simply because it can be subdivided, or because there are changes in the individuals involved or the roles that they play in the conspiracy." *United States v. Beals*, 698 F.3d 248, 259 (6th Cir. 2012) (quoting *United States v. Walls*, 293 F.3d 959, 967 (6th Cir. 2002)). The participants need not know each of the other co-conspirators nor the details of their actions or roles in the conspiracy. *Id.* But the government must show that the alleged co-conspirators agreed to participate in "a collective venture directed toward a common goal." *United States v. Swafford*, 512 F.3d 833, 841 (6th Cir. 2008) (quoting *Warner*, 690 F.2d at 549). "A tacit or material understanding among the parties to a conspiracy is sufficient to establish the agreement, [and] conspiracy may be inferred from circumstantial

evidence which may reasonably be interpreted as participation in a common plan." *United States v. Hughes*, 505 F.3d 578, 593 (6th Cir. 2007) (quoting *Walls*, 293 F.3d at 967).

The evidence presented at trial proved one, overarching conspiracy with a common goal to defraud insurance companies. All three clinics used the same scheme of recruiting "patients," staging car accidents, and submitting false claims for physical therapy services they never rendered. The overlapping of participants in their dealings was rampant. The clinics used the same lawyers. The clinics used the same physician to order physical therapy for their accident participants. The clinics employed overlapping patient recruiters. Even if Soca-Fernandez and Sosa-Baladron did not directly conduct the operation at H&H, the evidence overwhelmingly demonstrated a single conspiracy involving Revive, Renue, and H&H and that the defendants participated in that conspiracy. On these facts, the defendants cannot prove that the *only* reasonable conclusion was the existence of two separate conspiracies. Therefore, the government's trial proof did not create a variance from Count 1 of the indictment. And because Soca-Fernandez and Sosa-Baladron cannot prove a variance from the indictment, we need not address whether they suffered prejudice.

IV.

*Accomplice Liability.* Soca-Fernandez argues that the district court's decision to instruct the jury under an accomplice liability theory as to the mail fraud counts constituted a constructive amendment to the indictment, which charged her as a principal. As noted above, a constructive amendment occurs where the indictment is effectively altered by the presentation of evidence and jury instructions which change the material elements of an offense. We review such a claim *de novo*. *Mize*, 814 F.3d at 408.

Even if the indictment charges a defendant as a principal, the jury may convict the defendant as an accomplice if the proof at trial shows that she "merely aided and abetted." *United States v. Bradley*, 421 F.2d 924, 927 (6th Cir. 1970) (quoting *United States v. Russo*, 284 F.2d 539, 540 n.1 (2d Cir. 1960)). This is because an aiding and abetting theory is "embodied in every federal indictment, whether specifically charged or not." *United States v. McGee*, 529 F.3d 691, 695 (6th Cir. 2008) (quoting *United States v. Floyd*, 46 F. App'x 835, 836 (6th Cir. 2002)).

Here, the fourth superseding indictment specifically charged Soca-Fernandez as an accomplice as to the health-care fraud counts and cited 18 U.S.C. § 2, the aiding and abetting statute. The indictment did not, however, explicitly charge Soca-Fernandez as an accomplice as to the mail fraud counts.

Soca-Fernandez argues that the jury instructions altered the terms of the indictment such that a constructive amendment occurred. She cites no authority to support this proposition, instead pointing to an absence of authority permitting the court to instruct on aiding and abetting when the indictment charged a defendant as a principal on some counts and as an accomplice on other counts. She also asserts that the difference in theories of liability as recited in the indictment and jury instructions implicates notice and due process concerns. We have held, however, that a defendant "may be indicted for the commission of a substantive crime as a principal offender and convicted of aiding and abetting its commission . . . without violating federal due process." *United States v. VanderZwaag*, 467 F. App'x 402, 407 (6th Cir. 2012) (quoting *Hill v. Perini*, 788 F.2d 406, 407 (6th Cir. 1986)).

Because an aiding-and-abetting theory is implicitly embodied in every federal indictment, *McGee*, 529 F.3d at 695, Soca-Fernandez fails to show how the trial evidence and the accomplice liability jury instruction together altered the terms of the indictment such that she was convicted

of a crime other than the one the indictment charged. *See Hynes*, 467 F.3d at 962. Therefore, Soca-Fernandez has not proven a constructive amendment.

V.

*Multiplicity in the Indictment.* Soca-Fernandez further challenges her conviction by arguing that the fourth superseding indictment impermissibly charged her for a "single scheme" of health-care fraud in multiple counts and that this multiplicity violates double jeopardy. For the reasons that follow, we reject this argument.

When an indictment charges a single offense in separate counts, it is multiplicitous and implicates the Double Jeopardy clause. *United States v. Davis*, 306 F.3d 398, 417 (6th Cir. 2002). "Where an indictment includes more than one count charging the same statutory violation, the question is whether Congress intended the facts underlying each count to constitute a separate unit of prosecution." *United States v. Richards*, 659 F.3d 527, 547 (6th Cir. 2011). Whether an indictment is multiplicitous is a legal question that we review *de novo*. *Id.*

As explained above, to prove health-care fraud under 18 U.S.C. § 1347, the government had to prove that Soca-Fernandez: "(1) knowingly devised a scheme or artifice to defraud a health care benefit program in connection with the delivery of or payment for health care benefits, items, or services; (2) executed or attempted to execute this scheme or artifice to defraud; and (3) acted with intent to defraud." *Hunt*, 521 F.3d at 645 (citation omitted). A defendant need not have specific intent to commit a violation of the health care fraud statute. 18 U.S.C. § 1347(b).

Our court has not addressed the issue of whether an indictment can permissibly charge multiple counts of health care fraud when each count stems from a single scheme. Both Soca-Fernandez and the government implore us to resolve the multiplicity issue by looking to cases involving multiple counts of bank fraud under 18 U.S.C. § 1344. Like the health-care fraud statute,

the bank fraud statute proscribes the *execution of a scheme or artifice*. 18 U.S.C. § 1344. Because the health-care fraud statute was patterned after the bank fraud statute, we analyze Soca-Fernandez's multiplicity argument in the same way we have analyzed similar arguments in bank fraud cases.

A bank fraud scheme may be "executed" by one act or many acts, and whether each act is a separate execution—which may give rise to separate counts—depends on the nature of the scheme and how it is defined in the indictment. *United States v. Anders*, 14 F.3d 602, at \*11–14 (6th Cir. 1993) (unpublished table decision); *see also United States v. Abboud*, 438 F.3d 554, 567 (6th Cir. 2006) (finding each check in a check-kiting scheme amounted to a separate execution of bank fraud and may be charged separately). In *Anders*, the indictment charged the defendant with multiple counts of bank fraud in furtherance of a single scheme to defraud. *Id.* at \*11–12. The indictment described the general scheme, and each count charged the specific amount of money and the day it was diverted. *Id.* at \*12–13. Because each count constituted a separate and distinct execution of the fraud scheme, we held that the indictment was not multiplicitous. *Id.* at \*14.

As in *Anders*, the indictment described Soca-Fernandez's fraud scheme and then charged her fraudulent submissions of health-care forms as separate executions of that scheme. Soca-Fernandez concedes that "each fraudulent submission of health care benefit forms can sometimes support a single count for each submission." CA6 R. 39, Soca-Fernandez Br., at 58. She argues here that all of the health-care fraud counts in her indictment amount to one execution of "a broad and general scheme." *Id.* Her argument is unconvincing. The indictment recites the language contained in 18 U.S.C. § 1347 and defines the scheme to defraud as one involving false claims about physical therapy services provided for victims of staged automobile accidents. The indictment then describes each count separately, noting the patient involved, the insurance

company billed, the dates of alleged service, the date of claim, the amount claimed, and which clinic submitted the claim. This is akin to the scheme and indictment in *Anders* because each count constituted a separate execution of the fraud scheme.

Health care fraud cases from the Fifth and Ninth Circuits support this conclusion. In addressing an ex post facto argument in *United States v. Hickman*, the Fifth Circuit reasoned that "any scheme can be executed a number of times, and each execution may be charged as a separate count." 331 F.3d 439, 446 (5th Cir. 2003). The *Hickman* court defined the defendant's scheme as one that involved submitting fraudulent claims to health insurers and found that each submission of a health-care claim form constituted a separate execution of the fraud scheme. *Id.* at 446–47. The court concluded that, "with each claim submission, [the defendant] owed a new, independent obligation to be truthful to the insurer." *Id.* at 447. In *United States v. Awad*, the Ninth Circuit adopted *Hickman*'s reasoning and upheld an indictment charging twenty-four health-care fraud counts over the defendant's multiplicity challenge. 551 F.3d 930, 938 (9th Cir. 2009). Like the Fifth Circuit in *Hickman*, the *Awad* court analogized the health-care fraud statute to the bank fraud statute. *Id.* The Ninth Circuit had previously held that each execution of a bank fraud scheme may be charged as a separate count in an indictment. *Id.* (citing *United States v. Molinaro*, 11 F.3d 853, 860 (9th Cir. 1993)). The court extended this rule to health-care fraud and held that "[e]ach submission of a fraudulent claim to a health care benefit program, rather than being simply an act in furtherance of a larger scheme to defraud, is a separate execution of the scheme and is itself chargeable as a separate count." *Id.*

We find *Hickman* and *Awad* persuasive and adopt the analysis the Fifth and Ninth Circuits have applied. As we have previously ruled in the bank fraud context, we now hold that each fraudulent claim submitted by Soca-Fernandez amounted to a separate execution of her health-

care fraud scheme. Thus, the health-care fraud counts in Soca-Fernandez's indictment were not multiplicitous.

## VI.

*Evidentiary Rulings.* Soca-Fernandez argues that the district court erroneously admitted two pieces of evidence: (1) text messages between Acuna-Rosa and herself, and (2) photos of her house. We review evidentiary rulings for an abuse of discretion. *United States v. Marrero*, 651 F.3d 453, 471 (6th Cir. 2011). Under this standard, we may reverse only when we "lack[] a fair assurance that the outcome of a trial was not affected by evidentiary error" and are "firmly convinced that a mistake has been made." *United States v. Johnson*, 440 F.3d 832, 847 (6th Cir. 2006) (quoting *McCombs v. Meijer, Inc.*, 395 F.3d 346, 358 (6th Cir. 2005)). Here, the district court did not abuse its discretion in admitting the challenged evidence, and we thus affirm its evidentiary rulings.

## A. Text Messages

At trial, the government sought to introduce text messages between Acuna-Rosa and Soca-Fernandez, which were sent between August 2015 and April 2016 and discussed meeting with their lawyers, making bank withdrawals, sending funds, and contacting Sosa-Baladron. The district court found that the messages constituted admissions by a party opponent and statements made by a party's co-conspirator, and thus were excluded from the definition of hearsay by rule. *See* Fed. R. Evid. 801(d)(2)(A), (E). On appeal, Soca-Fernandez argues that the district court incorrectly admitted these messages because they lack relevance and are unduly prejudicial, and because Acuna-Rosa's statements do not fall within the co-conspirator exception to the rule against hearsay.

The co-conspirator rule provides that a statement is not hearsay if it "is offered against an opposing party and . . . was made by the party's coconspirator during and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2). For Acuna-Rosa's statements to qualify as co-conspirator admissions, the court must find—by a preponderance of the evidence—that a conspiracy existed, that Soca-Fernandez and Acuna-Rosa belonged to the conspiracy, and that the statements were made in the course of and in furtherance of the conspiracy.[2] *United States v. Gonzales*, 501 F.3d 630, 636 (6th Cir. 2007). Whether a statement is made in furtherance of a conspiracy depends on the conspiracy's objectives. *United States v. Johnson*, 443 F. App'x 85, 92–93 (6th Cir. 2011). If an out-of-court statement is "intended to promote" a continued objective of the conspiracy, then it is made in furtherance of the conspiracy and qualifies as an admission under Rule 801(d)(2)(E). *United States v. Warman*, 578 F.3d 320, 338 (6th Cir. 2009) (citing *United States v. Henderson*, 307 F. App'x 970, 977 (6th Cir. 2009)).

In *United States v. Johnson*, we found that statements made by the defendant about "hush money" following a murder were made in furtherance of a conspiracy because an additional objective of the murder-for-hire conspiracy was the collection of insurance proceeds. 443 F. App'x at 92–93. Like the conspiracy in *Johnson*, the conspiracy here involved the additional or continued objective of collecting and distributing the money from insurance proceeds. At trial, the district court specifically found that the messages addressed "the object of the conspiracy, which of course, [was] to collect money." DE 368, Trial Tr. Vol. V, Page ID 3288. Because the content of the text messages promoted an objective of the conspiracy, the statements were made in furtherance of the conspiracy.

---

[2] The district court made these preliminary findings and issued a conditional ruling on the statements' admissibility. It later made the required findings regarding this application of the co-conspirator exclusion to the hearsay rule, pursuant to *United States v. Enright*, 579 F.2d 980 (6th Cir. 1978), and ruled that statements made by all conspirators in this case were admissible.

Soca-Fernandez also challenges the district court's finding that a conspiracy existed, at least at the time the text messages were exchanged. She argues that "[t]he text messages themselves were the only basis for the finding [of] an ongoing conspiracy and cannot be used foundationally for admission under Rule 801(d)(2)(E)." CA6 R. 39, Soca-Fernandez Br., at 63. According to Soca-Fernandez, the government could only show the existence of a conspiracy by impermissibly "bootstrapping" the content of the messages, using them to lay a foundation for their own admissibility. *Id.* But while "the contents of the declarant's statement do not alone suffice to establish a conspiracy in which the declarant and the defendant participated," Fed. R. Evid. 801 (Advisory Committee Note), the district court may consider such statement when making a preliminary determination of admissibility under Fed. R. Evid. 104(a). *United States v. Wilson*, 168 F.3d 916, 920–21 (6th Cir. 1999) (citing *Bourjaily v. United States*, 438 U.S. 171, 181 (1987)). The district court thus did not err by considering the messages' content in finding the existence of a conspiracy.[3]

Soca-Fernandez additionally argues that the district court should not have admitted the text messages because they lacked relevance and were unduly prejudicial. Of course, only relevant evidence is admissible. Fed. R. Evid. 402. Evidence is relevant if it has any tendency to make a fact of consequence more or less probable than it would be without that evidence. Fed. R. Evid. 401(a)–(b). We employ an "extremely liberal" relevancy standard. *United States v. Ramer*, 883 F.3d 659, 681 (6th Cir. 2018) (quoting *United States v. Collins*, 799 F.3d 554, 578 (6th Cir. 2015)). The text messages between Soca-Fernandez and Acuna-Rosa discussed meeting with

---

[3] It is unclear from the transcript what other circumstances, if any, the district court considered in determining the existence of an ongoing conspiracy at the time the text messages were exchanged. Soca-Fernandez argues that this is fatal and constitutes an abuse of discretion. However, there was ample evidence introduced at trial regarding the continued conspiracy and collection of insurance proceeds. For example, the Whiting Law Firm was still sending settlement checks to Acuna-Rosa after the firm terminated its relationship with the three clinics in early 2016. Thus, any alleged shortcoming in the district court's analysis was harmless.

lawyers, withdrawing money from the bank, sending funds, and, importantly, contacting Sosa-Baladron. These statements easily meet the low bar of relevancy because they make a fact of consequence—whether Soca-Fernandez, Sosa-Baladron, and Acuna-Rosa were in a conspiracy to defraud insurance companies—more probable.

Finally, Soca-Fernandez contends that the danger of unfair prejudice from the text messages outweighed any probative value they had. According to Soca-Fernandez, the messages' admission prejudiced her "by the danger of confusion or misinterpretation by the jury," and she goes on to explain that the messages' relevance depended on "[f]ar too many . . . impermissible inferences" connecting the messages to the fraud. CA6 R. 39, Soca-Fernandez Br., at 62–64. Rule 403 instructs courts to exclude relevant evidence if "its probative value is substantially outweighed by the danger of unfair prejudice." *Huddleston v. United States*, 485 U.S. 681, 687 (1988); Fed. R. Evid. 403. While the district court did not balance these considerations on the record below, we may do so on appeal. *See United States v. Jackson-Randolph*, 282 F.3d 369, 378 (6th Cir. 2002) (balancing the probative value against the risk of unfair prejudice when the district court failed to do so explicitly); *United States v. Sanders*, 95 F.3d 449, 453 (6th Cir. 1996) (same).

The text messages are relevant; they tend to show that Acuna-Rosa, Soca-Fernandez, and Sosa-Baladron were engaged in a conspiracy and that they were distributing proceeds. Simply because the messages were exchanged after the clinics closed does not make the statements contained therein unfairly prejudicial or any less probative, and neither does the fact that the messages' relevance to the conspiracy required drawing inferences. On balance, the probative value of the text messages was not substantially outweighed by any risk of undue prejudice to Soca-Fernandez. The district court therefore did not abuse its discretion when it admitted the statements.

B.  Photographs of Soca-Fernandez's House

At trial, the government introduced into evidence two photos of Soca-Fernandez's home in Tampa, Florida, where she lived with Sosa-Baladron and their children.  The district court overruled Soca-Fernandez's objection, finding that the probative value of the photos was not substantially outweighed by the danger of unfair prejudice.  The court reasoned that "[i]t's natural to present evidence of possible expenditures by defendants in terms of how they are spending money from the alleged fraud," and that the jury should see the evidence.  DE 369, Trial Tr. Vol. VI, Page ID 3309.

We first address relevance.  Soca-Fernandez correctly points out that the home has no direct connection to this case beyond the fact that Soca-Fernandez and Sosa-Baladron lived there during the years in which they were engaged in a conspiracy to defraud the insurance companies through their clinics.  Despite the lack of a direct connection to the fraud scheme and conspiracy, the photographs of the home are relevant as evidence of unexplained wealth.  *See Jackson-Randolph*, 282 F.3d at 378.  A court may admit this "lifestyle evidence" if three factors are satisfied: "(1) there is other credible evidence, direct or circumstantial, of the illegal activity; (2) the money spent was not available to the defendant from a legitimate source; and (3) the accumulation of great wealth or extravagant spending relates to the period of the alleged illegal activity."  *Id.*  The government introduced credible evidence in the form of numerous witnesses who testified that Soca-Fernandez participated in the fraud scheme and shared in its profits.  There was no evidence that Soca-Fernandez had other sources of income to make her monthly mortgage payments of $2,300.  Finally, even though the purchase of the house predated the opening of the first clinic, Soca-Fernandez owned and lived in the house during the period of the conspiracy and fraud scheme.

The lack of a direct connection between the house—as portrayed in the photos at trial—and Soca-Fernandez's illegal activity does not negate the admissibility of the photos as lifestyle, or unexplained wealth, evidence. "While demonstrating a direct connection would certainly enhance the probative value of such evidence, it is not necessary." *Jackson-Randolph*, 282 F.3d at 379. What is important is a "natural connection" from which the jury may reasonably infer that the funds derived from the illegal activity financed the subject of the wealth evidence. *See United States v. Amerine*, 411 F.2d 1130, 1132 (6th Cir. 1969). Here, a jury could reasonably infer a natural connection between Soca-Fernandez's home and the proceeds of her fraud scheme. Because the photos of the home support this inference, they satisfy the "extremely liberal" standard of relevance this court applies. *See Ramer*, 883 F.3d at 681. The district court, therefore, did not abuse its discretion in determining that the photos were relevant.

Turning to unfair prejudice, we now ask whether the probative value of the photos is substantially outweighed by the risk of unfair prejudice. The balancing test of Rule 403 "is strongly weighted toward admission." *United States v. Asher*, 910 F.3d 854, 860 (6th Cir. 2018). We must "review the admitted evidence 'in the light most favorable to its proponent, maximizing its probative value and minimizing its prejudicial effect.'" *Id.* (quoting *United States v. Carney*, 387 F.3d 436, 451 (6th Cir. 2004).

Soca-Fernandez argues that the photos were unduly prejudicial because the government theorized that her "nice home" must have been financed by the cash profits of the fraud scheme. CA6 R. 39, Soca-Fernandez Br., at 61. In closing, the government alluded to the photos when it argued that Soca-Fernandez and Sosa-Baladron implemented the fraud scheme in Michigan so they could "sit on their beach in their beautiful Florida home, and never come back." DE 370, Trial Tr. Vol. VII, Page ID 3548. Her argument is unpersuasive for two reasons. First, Soca-

Fernandez did not object to this statement. Second, closing argument is not *evidence*. And while "the government may not rely on prejudicial facts not in evidence when making its closing arguments," *United States v. Roach*, 502 F.3d 425, 434 (6th Cir. 2007), the government did not do so here. The prosecutor indirectly referenced Soca-Fernandez's home in closing, and the fact that Soca-Fernandez lived in a "nice home" was in evidence. CA6 R. 39, Soca-Fernandez Br., at 61.

Giving the photos their maximum probative value and minimal prejudicial effect, their probative value was not substantially outweighed by the danger of unfair prejudice. We conclude that the district court did not abuse its discretion in admitting the photos of Soca-Fernandez's home into evidence.

VII.

*Sentence Enhancements.* Finally, Soca-Fernandez and Sosa-Baladron challenge the sentence enhancements imposed by the district court. Both argue that the district court erroneously applied enhancements for obstruction of justice, U.S.S.G. § 3C1.1, and for participation in a fraudulent scheme that created a risk of serious bodily harm, U.S.S.G. § 2B1.1(b)(15).[4] Sosa-Baladron further challenges the aggravating-role adjustment, U.S.S.G. § 3B1.1, for his leadership in the offense. In applying the Guidelines, we review the district court's factual findings for clear error and its legal conclusions *de novo*. *United States v. Moon*, 513 F.3d 527, 539–40 (6th Cir. 2008). The government need only show by a preponderance of the evidence that a sentence enhancement applies. *United States v. Donadeo*, 910 F.3d 886, 901 (6th Cir. 2018). Giving due

---

[4] Soca-Fernandez and Sosa-Baladron were sentenced in August 2017, and thus the 2016 version of the U.S. Sentencing Guidelines governed at their sentencing. *See Huff v. United States*, 734 F.3d 600, 608 (6th Cir. 2013) ("Generally, a district court applies the version of the Guidelines in effect at the time of sentencing."). The enhancement for creating a risk of serious bodily harm was moved to § 2B1.1(b)(16) in the 2018 Guidelines.

deference to the district court's factual findings, we hold that the district court properly found that the sentence enhancements applied and thus affirm the defendants' sentences.

### A. Obstruction of Justice

The Guidelines provide for a sentence enhancement if a "defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction." U.S.S.G. § 3C1.1. Relevant here, obstructive conduct includes the "threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so," *id.* § 3C1.1 cmt. n.4(A), as well as "attempting to suborn perjury," *id.* § 3C1.1 cmt. n.4(B).

In its presentence investigation reports ("PSR") for Soca-Fernandez and Sosa-Baladron, the Probation Office recommended a two-level enhancement for obstruction of justice based on their pretrial contacts with Martinez-Lopez's wife, Katia Mok-Tornes. Soca-Fernandez visited Mok-Tornes in October 2016 and insisted on speaking with Martinez-Lopez. After Mok-Tornes refused to let her inside, Soca-Fernandez said she wanted Martinez-Lopez to tell prosecutors that Acuna-Rosa was testifying against Martinez-Lopez, Sosa-Baladron, and Soca-Fernandez because of a family feud. Soca-Fernandez returned to Mok-Tornes's house in February 2017—this time with Sosa-Baladron. Soca-Fernandez went inside and offered Mok-Tornes money while Sosa-Baladron sat in the vehicle. Knowing that Martinez-Lopez's bail had been revoked, Soca-Fernandez claimed that she offered the money to "help" Mok-Tornes with home and family expenses. DE 383, Soca-Fernandez Sentencing Tr., Page ID 3754. Mok-Tornes testified, however, that she believed the offer of money "could be about [Martinez-Lopez] not going against [Soca-Fernandez] and [Sosa-Baladron]," *id.* at 3755, and that, if she accepted the money, Soca-Fernandez and Sosa-Baladron would expect Martinez-Lopez not to testify against them.

The district court found that the defendants intended to influence the prosecution in this case by the two visits to Mok-Tornes and applied the two-level enhancements to the sentences of both defendants. In light of Mok-Tornes's testimony, the court inferred that Soca-Fernandez unlawfully attempted to influence Martinez-Lopez's testimony by providing a false story to Mok-Tornes's wife and offering her money. With regard to Sosa-Baladron, the court found that he was "the functional equivalent of the wheel man in an armed robbery," that he knew "the nature of the conversation that [Soca-Fernandez] was going to have with [Mok-Tornes]," and that Sosa-Baladron and Soca-Fernandez were clearly "working together" to influence Martinez-Lopez's testimony. DE 381, Sosa-Baladron Sentencing Tr., Page ID 3693–94.

We review this decision for clear error because "the determination of whether a set of facts constitutes obstruction of justice is a fact-bound decision." *Jackson-Randolph*, 282 F.3d at 389.[5]

For the obstruction-of-justice enhancement to apply, the defendants must have taken some substantial step toward obstruction and intended to obstruct justice. *See United States v. Huntley*, 530 F. App'x 454, 457 (6th Cir. 2013). Moreover, in considering whether a defendant had the requisite intent, other circuits have said that the court may draw all reasonable inferences from the defendant's words and conduct, as well as other relevant circumstances. *See United States v. Reeves*, 586 F.3d 20, 23 (D.C. Cir. 2009); *United States v. Sisti*, 91 F.3d 305, 313 (2d Cir. 1996). The enhancement applies when obstructive conduct targets an intermediary, either directly or indirectly. *See United States v. Pinkney*, 644 F. App'x 478, 484 (6th Cir. 2016); *United States v. Moss*, 9 F.3d 543, 553–54 (6th Cir. 1993). Further, even subtle attempts to persuade a witness or

---

[5] At times, we have applied *de novo* review to this question, reasoning that whether specific facts amount to obstructive conduct is a mixed question of fact and law. *See, e.g.*, *Donadeo*, 910 F.3d at 893; *United States v. Henry*, 819 F.3d 856, 872 (6th Cir. 2016). However, because the district court's legal decision here "depend[ed] heavily upon an understanding of the significance of case-specific details," *Jackson-Randolph*, 282 F.3d at 389 (quoting *Buford v. United States*, 532 U.S. 59, 65 (2001)), the appropriate standard of review is clear error.

co-defendant to testify falsely justify this enhancement. *See United States v. Cannon*, 552 F. App'x 512, 515 (6th Cir. 2014) (noting that "the obstruction enhancement covers subtle efforts no less than brazen ones"); *United States v. Bingham*, 81 F.3d 617, 632 (6th Cir. 1996) (upholding the enhancement where defendant attempted "indirectly, and perhaps even somewhat ambiguously, to have" a witness testify falsely).

Under the government's theory, Soca-Fernandez obstructed justice by indirectly "plant[ing] the seed" of false testimony with Mok-Tornes and then doubled down by offering money. DE 383, Soca-Fernandez Sentencing Tr., Page ID 3778–79. The district court agreed and found that Soca-Fernandez intended to obstruct justice and took a substantial step by providing the false story of a family feud to Mok-Tornes and offering her money. The district court additionally found that Sosa-Baladron's role in driving Soca-Fernandez amounted to obstructive conduct as well, inferring Sosa-Baladron's knowledge and intent based on the circumstances of his relationship with Soca-Fernandez throughout the conspiracy.

That Soca-Fernandez contacted Mok-Tornes with the intention of persuading Martinez-Lopez to testify falsely is an entirely plausible and likely explanation of her two pre-trial visits and offer of money. The district court's finding as to Sosa-Baladron's intent to obstruct is a closer question. However, the circumstantial evidence and nature of Soca-Fernandez and Sosa-Baladron's partnership throughout the conspiracy justifies the district court's inference on that issue. The mere possibility of an alternative interpretation of the facts—that Soca-Fernandez simply wanted to be charitable and Sosa-Baladron was unaware of the exact conversations with Mok-Tornes—is not enough to show clear error. Considering the evidence and according due deference to the district court's findings, we conclude the district court's determination that Soca-

Fernandez and Sosa-Baladron obstructed justice by attempting to persuade a witness to provide false testimony passes clear-error review.

## B. Risk of Serious Bodily Injury

The 2016 Guidelines also provide for a two-level sentence enhancement if the offense involved the conscious or reckless risk of death or serious bodily injury. U.S.S.G. § 2B1.1(b)(15)(A). "Serious bodily injury" is defined as one "involving extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation." *Id.* § 1B1.1 cmt. n.1(L).

The Probation Office recommended this sentence enhancement for both Sosa-Baladron and Soca-Fernandez based on the numerous staged or planned car accidents involved in their scheme to defraud insurance companies. Various participants in the defendants' scheme testified at trial that they staged their accidents by running into a tree or bush, running off the road, or running into another vehicle. The defendants left the decision regarding the method up to the participants as long as it resulted in a police report. Even though the co-conspirators reassured participants that no one would get hurt in these staged accidents, they arranged for some accidents to occur under conditions of rain, snow, or ice. At least one of the participants had a headache and aggravated a back injury after sliding off an icy road and hitting a tree. Based on the proof at trial concerning the circumstances of the accidents, the district court determined that the defendants' offenses involved the risk contemplated by section 2B1.1(b)(15)(A) and overruled their objections to this enhancement.

In a fraud case, this enhancement applies if the risk of serious bodily injury is "part and parcel of the scheme to defraud." *United States v. Hall*, 71 F.3d 569, 571 (6th Cir. 1995).[6] This enhancement does not require actual injury, but it does require that the reckless risk was "actual, not conjectural." *United States v. Vivit*, 214 F.3d 908, 922 (7th Cir. 2000). While we have not considered the enhancement in this particular type of fraud scheme, two of our sister circuits have found the enhancement applicable in staged car accident schemes. *See United States v. Lucien*, 347 F.3d 45, 56 (2d Cir. 2003) (upholding sentence enhancement in a fraud scheme involving staged accidents where the district court found that the "risk of bodily injury inheres in any deliberately caused accident" and that "the risk of bodily injury is patent in this type of criminal activity"); *United States v. Hoffman*, 9 F.3d 49, 50 (8th Cir. 1993) (per curiam) (upholding sentence enhancement for a defendant who arranged low-speed automobile accidents and submitted fraudulent claims to insurance companies because the risk of seriously bodily injury was "inherent" in the staged accidents). Soca-Fernandez and Sosa-Baladron attempt to distinguish *Hoffman* and *Lucien* by arguing that those cases involved actual collisions with unsuspecting motorists. Their argument is inapposite. As in *Hoffman* and *Lucien*, the focus here is on actual *risk* of serious bodily injury, not on whether there were actual injuries. Soca-Fernandez and Sosa-Baladron's fraud scheme involved staging accidents that carried an inherent risk of seriously bodily injury to the participants and other drivers or pedestrians. Therefore, we hold that the district court properly applied the enhancement under U.S.S.G. § 2B1.1(b)(15)(A) to Sosa-Baladron's and Soca-Fernandez's sentences.

---

[6] *Hall* and other cases that we cite *infra* interpret an enhancement under U.S.S.G. § 2F1.1(b) in a prior version of the Guidelines, which provided for an enhancement if a fraud or deceit offense involved "the conscious or reckless risk of serious bodily injury." *See, e.g.*, *Hall*, 71 F.3d at 571. Section 2F1.1 was deleted from the Guidelines in 2001 when it was consolidated with § 2B1.1. Because the enhancement under § 2B1.1(b)(15)(A) of the 2016 Guidelines contains the same language as this prior enhancement, we continue to rely on these cases.

C. Leadership Role in the Offense

The Guidelines provide for a sentence enhancement based on a defendant's leadership role "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants." U.S.S.G. § 3B1.1(a). Relevant considerations include "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." *Id.* § 3B1.1 cmt. n.4; *see also United States v. Walls*, 546 F.3d 728, 735 (6th Cir. 2008) (quoting *United States v. McDaniel*, 398 F.3d 540, 551 (6th Cir. 2005)). Further, for this enhancement to apply, the "defendant must have exerted control over at least one individual within a criminal organization." *United States v. Vandeberg*, 201 F.3d 805, 811 (6th Cir. 2000) (quoting *United States v. Gort Didonato*, 109 F.3d 318, 321 (6th Cir. 1997)).

Based on this Guideline, the Probation Office recommended a four-level adjustment to Sosa-Baladron's offense level for his aggravating role in the fraud scheme. The district court accepted the recommendation and applied the enhancement to Sosa-Baladron's sentence for being a leader or organizer. In reaching this conclusion, the district court made the following findings. First, Sosa-Baladron participated in the recruitment of Dr. Borrero to play the role of ordering treatment for the individuals in staged accidents. The district court described this recruitment meeting as "one of the linchpins of this conspiracy." DE 381, Sosa-Baladron Sentencing Tr., Page ID 3694. Moreover, the district court found that Sosa-Baladron was involved in almost all of the "critical events" in the course of the fraud scheme, and that he specifically supervised or exerted control over Gonzalez and Pardo-Oiz in the November 11, 2013 staged accident. *Id.* at 3695. The

district court further noted that Sosa-Baladron had an important role in managing and collecting the proceeds of the fraud scheme based on the text messages indicating that Sosa-Baladron was "demanding [Acuna-Rosa] collect and share money," the photo showing Sosa-Baladron making bank withdrawals, and the evidence that Sosa-Baladron assisted Soca-Fernandez in preparing false billings. *Id.* Finally, the district court found that this fraud scheme clearly involved five or more participants.

On appeal, Sosa-Baladron submits that Soca-Fernandez was the actual "mastermind behind the operation" and that the district court erred when it attributed her actions to Sosa-Baladron. CA6 R. 36, Sosa-Baladron Br., at 26. He argues that the trial evidence only proved his presence and involvement in peripheral aspects of the clinics' operations. His arguments are unavailing. Even if Soca-Fernandez played a leading role in the fraud scheme, that would not diminish Sosa-Baladron's leadership or organizational role. Indeed, the Guidelines contemplate criminal activities involving "more than one person who qualifies as a leader or organizer of a criminal association or conspiracy." U.S.S.G. § 3B1.1 cmt. n.4. Further, the district court did not credit Sosa-Baladron with Soca-Fernandez's actions. The court made explicit findings regarding Sosa-Baladron's own role in making decisions, recruiting accomplices, sharing in the scheme's profits, and exerting control over multiple individuals within the scheme.

The district court did not clearly err in its factual findings, and these findings satisfy the criteria for a four-level enhancement to Sosa-Baladron's Guideline calculation under U.S.S.G. § 3B1.1.

## VIII.

For the foregoing reasons, we affirm the convictions and sentences of Sosa-Baladron and Soca-Fernandez.