**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 22-30068 |
| *Plaintiff-Appellee*, | D.C. No. 3:18-cr-00319-MO-1 |
| v. | |
| MARK LEROY DENCKLAU, | OPINION |
| *Defendant-Appellant*. | |

| | |
|---|---|
| UNITED STATES OF AMERICA, | No.22-30069 |
| *Plaintiff-Appellee*, | D.C. No. 3:18-cr-00319-MO-6 |
| v. | |
| CHAD LEROY ERICKSON, | |
| *Defendant-Appellant*. | |

Appeal from the United States District Court
for the District of Oregon
Michael W. Mosman, District Judge, Presiding

Argued and Submitted November 7, 2025
Portland, Oregon

Filed November 28, 2025

Before:  MILAN D. SMITH, JR., JACQUELINE H. NGUYEN, and HOLLY A. THOMAS, Circuit Judges.

Opinion by Judge Milan D. Smith, Jr.

## SUMMARY[*]

### Criminal Law

The panel affirmed Mark Leroy Dencklau's and Chad Leroy Erickson's convictions and life sentences for offenses arising from the kidnapping and murder of a former fellow member of the Gypsy Joker Motorcycle Club (GJMC).

Dencklau and Erickson were both convicted of murder in violation of the Violent Crimes in Aid of Racketeering statute (VICAR) (Count 2), VICAR kidnapping resulting in death (Count 3), kidnapping resulting in death (Count 4), and conspiracy to commit kidnapping resulting in death (Count 5).  Dencklau was also convicted of racketeering conspiracy (Count 1).

Affirming the district court's denial of the dismissal of Counts 2 and 3, the panel held that where a VICAR indictment tracks the VICAR statute's language, it sufficiently informs the defendant of his charge, even if it

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

does not enumerate the elements of the predicate state law claim.

Rejecting Dencklau's arguments that the district court erred in three evidentiary rulings related to coconspirator Tiler Pribbernow, another GJMC associate, the panel held that the district court did not err in excluding evidence of Pribbernow's reputation for violence under Fed. R. Evid. 404, in excluding evidence of Pribbernow's past violent acts under Fed. R. Evid. 403 and 404, or in barring Dencklau from re-cross-examining Pribbernow about his military discharge.

The panel rejected Erickson's arguments that the district court abused its discretion under Fed. R. Evid. 702 and 403 by excluding expert testimony as to his alleged mental deficits and that the exclusion violated his Fifth and Sixth Amendment right to present his defense.

The panel held that the district court did not abuse its discretion or plainly err by allowing the Government and its witnesses to use the word "gang" to describe the GJMC, by admitting evidence regarding GJMC's "culture of misogyny," or by allowing the prosecutors' use of race-based evidence to show the GJMC's cohesion.

The panel held that an isolated comment by a witness stating that Erickson's counsel was lying about phone calls made by Dencklau after he was robbed survives plain error review.

The panel held that there was no error in the district court's VICAR-purpose jury instruction, which required the enterprise-related purpose to be substantial, but not necessarily primary.

The panel held that the district court did not err by instructing the jury on the proper consideration of potential punishment faced by the defendants or cooperating witnesses. The totality of the instructions illustrates the district court's good faith attempt to keep the jury in their assigned lane: focused on the facts, the evidence, and the witnesses' credibility. This approach aligns with the purpose behind the general rule against instructions related to potential punishment and did not constitute an abuse of discretion.

Finally, the panel held that circuit precedent forecloses any argument that a mandatory sentence of life without the possibility of parole violates the Eighth Amendment.

## COUNSEL

Sangita K. Rao (argued), Attorney, Appellate Section; Matthew R. Galeotti, Head of Criminal Division; United States Department of Justice, Washington D.C.; Leah K. Bolstad, and Steven T. Mygrant, Assistant United States Attorneys; Suzanne Miles, Chief, Criminal Appeals Section; William M. Narus, Acting United States Attorney; Office of the United States Attorney, United States Department of Justice, Portland, Oregon; for Plaintiff-Appellee.

Elizabeth G. Daily (argued), Assistant Federal Public Defender, Office of the Federal Public Defender, Portland, Oregon; Laura Graser (argued), Portland, Oregon; Ryan T. O'Connor, O'Connor Weber LLC, Portland, Oregon; for Defendants-Appellants.

# OPINION

M. SMITH, Circuit Judge:

Members of a motorcycle club kidnapped and murdered one of their former associates. Two of those members were convicted on murder and racketeering charges and now appeal their convictions and sentences, arguing that the district court violated the Federal Rules of Evidence (Rules) and the Constitution prior to and throughout their trials. We disagree, and we affirm.

## FACTS AND PRIOR PROCEEDINGS

Defendants-Appellants Mark Leroy Dencklau and Chad Leroy Erickson appeal their convictions and sentences of life imprisonment for murder in violation of the Violent Crimes in Aid of Racketeering statute (VICAR), 18 U.S.C. § 1959(a)(1); VICAR kidnapping resulting in death in violation of 18 U.S.C. § 1959(a)(1); kidnapping resulting in death in violation of 18 U.S.C. § 1201(a)(1); and conspiracy to commit kidnapping resulting in death, in violation of 18 U.S.C. §§ 1201(a)(1) and (c). Dencklau was also convicted of racketeering conspiracy, in violation of 18 U.S.C. § 1962(d).

## I. Factual Background

### a. The Gypsy Joker Motorcycle Club

Both Dencklau and Erickson were members of the Gypsy Joker Motorcycle Club (GJMC). The GJMC is an international motorcycle club with chapters in Australia, Germany, Norway, and the Northwest United States, including the States of Oregon and Washington. The club self-identifies as a "one percent" club, referring to the

supposed "one percent" of motorcycle drivers who do not follow the law. The GJMC is hierarchical, with a national leadership team and local chapters with their own leadership structures.

Joining a GJMC chapter requires following a prescribed process, beginning with a trial period known as a "hang around," and then a prospecting period of increasing involvement, before full membership. Members pay dues, attend weekly meetings known as Church, and participate in club events. Club members also undertake various criminal activities, such as buying and selling drugs, robbery, and assault. Prospective members are expected to participate in all GJMC activities, criminal and otherwise.

Defendant-Appellant Dencklau was president of GJMC's Portland chapter at the time of his arrest. As president, he directed various criminal activities, which included engaging in violence and drug trafficking. Defendant-Appellant Erickson began "prospecting" for the Portland chapter in 2013 and became a full member in September 2014.

### b. The Kidnapping and Murder of Gypsy Joker Member Robert Huggins

On July 1, 2015, former GJMC member Robert Huggins (also known as "Bagger") was found dead, beaten, and mutilated in a field in Ridgefield, Washington. His death was officially deemed a "homicide."

Huggins was kicked out of GJMC in 2014 for stealing money. When Huggins was kicked out of the club, multiple members of the Portland chapter, including Dencklau and Erickson, beat him. He was only released from the beating after signing over his motorcycle and a girlfriend's vehicle,

and having his estranged wife bring money to the clubhouse. Huggins was considered "out bad," meaning he left in bad standing due to the theft and was to be harmed by GJMC members if they subsequently saw him.

The next year, Huggins robbed Dencklau's home— seemingly in retaliation for the beating—while Dencklau's then-girlfriend Nicole Stephens was home. Huggins and two associates zip-tied Stephens and stole televisions and firearms. After finding out about the robbery, Dencklau told GJMC associates to make it known that the club was looking for Huggins. After a series of leads, Dencklau and four other GJMC associates tracked Huggins to a home in Northeast Portland. Dencklau and others turned their phones off or did not bring them while they looked for Huggins. Dencklau and his group forcibly took Huggins from a car parked at the home and drove him to a property in Woodland, Washington, where Erickson and another GJMC associate met them. The group moved Huggins to a shed on the property, then tortured him over the course of several hours with fists, bats, knives, kicks, and waterboarding. At the end of the beatings, Dencklau ordered one of the GJMC associates to smash Huggins' hands and hit him in the head with a baseball bat. The GJMC associates then loaded Huggins into a car and dumped his body in a field in Ridgefield, Washington, where he was later found deceased.

## II. Procedural History

Dencklau was arrested on state charges for Huggins' murder, alongside two other GJMC associates, but not Erickson. Federal prosecutors later obtained an indictment from a federal grand jury charging Dencklau, Erickson, and four other GJMC codefendants with conspiracy pursuant to the Racketeer Influenced and Corrupt Organizations Act

(RICO), 18 U.S.C. §§ 1961–68. The indictment also charged Dencklau, Erickson, and three of the codefendants with four counts involving Huggins' kidnapping and murder. That is the operative indictment in this case.

The indictment charged Dencklau, Erickson, and others with racketeering conspiracy, in violation of 18 U.S.C. § 1962(d) (Count 1); VICAR murder, in violation of 18 U.S.C. § 1959(a)(1) (Count 2); VICAR kidnapping resulting in death, in violation of 18 U.S.C. § 1959(a)(1) (Count 3); kidnapping resulting in death, in violation of 18 U.S.C. § 1201(a)(1) (Count 4); and conspiracy to commit kidnapping resulting in death, in violation of 18 U.S.C. § 1201(a)(1) and (c) (Count 5). The grand jury made special findings in support of the death penalty for Counts 2 and 4. Most of the defendants took plea deals, while Dencklau, Erickson, and one other co-defendant were jointly tried. The jury found Dencklau guilty on all counts and Erickson guilty on all but Count 1, on which the jury acquitted him. The district court sentenced both Defendant-Appellants to concurrent life terms on each count.

Both defendants appeal, challenging various district court decisions at trial. We have jurisdiction pursuant to 18 U.S.C. § 3742 and 28 U.S.C. § 1291, and we affirm.

## ANALYSIS

Defendants offer eight arguments challenging the proceedings at the district court. We reject each in turn.

### I. Sufficiency of the VICAR Indictments

Because Counts 2 and 3 of the indictments adequately recited the elements of the VICAR offense, they were legally

sufficient.[1] We review the legal sufficiency of an indictment de novo. *United States v. Awad*, 551 F.3d 930, 935 (9th Cir. 2009). "An indictment is sufficient if it contains the elements of the charged crime in adequate detail to inform the defendant of the charge and to enable him to plead double jeopardy." *Id.* (internal quotation marks omitted). "The test for sufficiency of the indictment is not whether it could have been framed in a more satisfactory manner, but whether it conforms to minimal constitutional standards." *Id.* (internal quotation marks omitted).

The Violent Crime in Aid of Racketeering (VICAR) statute "punishes murder and other crimes committed 'for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering

---

[1] Count 2 alleges, in relevant part: "On or between June 30 and July 1, 2015, in the District of Oregon, and Western District of Washington, for the purpose of maintaining and increasing position in the GJOMC, an enterprise engaged in racketeering activity, the defendants, MARK LEROY DENCKLAU [and] CHAD LEROY ERICKSON . . . aiding and abetting each other, unlawfully and knowingly committed, and aided and abetted the commission of, the murder of Robert Huggins, in violation of Oregon Revised Statutes 161.155 (aid and abet), 163.115(l)(a) (Murder) and 163.115(1)(b) (Felony Murder); and Washington Revised Statutes 9A.08.020 (Liability for conduct of another—Complicity), and 9A.32.030 (Murder in first degree/Felony Murder); All in violation of Title 18, United States Code, Sections 1959(a)(1) and 2."

Count 3 alleges, in relevant part: "On or between June 30 and July 1, 2015, in the District of Oregon, and Western District of Washington, for the purpose of maintaining and increasing position in the GJOMC, an enterprise engaged in racketeering activity, the defendants, MARK LEROY DENCKLAU [and] CHAD LEROY ERICKSON . . . aiding and abetting each other, unlawfully and knowingly kidnapped Robert Higgins, in violation of United States Code Sections 1201(a)(1) and 2; All in violation of 18 U.S.C. Section 1959(a)(1) and 2."

activity.'"  *United States v. Manning*, 151 F.4th 1144, 1148 (9th Cir. 2025) (quoting 18 U.S.C. § 1959(a)).  The statute has four mandatory elements: "(1) that the criminal organization exists;  (2) that the organization is a racketeering enterprise; (3) that the defendant[ ] committed a violent crime; and (4) that [the defendant] acted for the purpose of promoting [his] position in a racketeering enterprise." *United States v. Banks*, 514 F.3d 959, 964 (9th Cir. 2008) (alterations in original) (quoting *United States v. Bracy*, 67 F.3d 1421, 1429 (9th Cir.1995)).

Our circuit has not yet ruled directly on whether a VICAR indictment must also include the elements of the predicate violent offenses.  We previously have held that an indictment that tracks the charging statute is generally sufficient.  *See United States v. Alsop*, 479 F.2d 65, 66 (9th Cir. 1973).   And in *United States v. Fernandez*, we confirmed that an indictment that "expressly alleged the required elements" of a VICAR violation itself was "sufficient," even where it did not allege the elements of the predicate offenses.   388 F.3d 1199, 1220 (9th Cir. 2004), *modified,* 425 F.3d 1248 (9th Cir. 2005).

More directly, the Second Circuit has instructed that "only a generic definition of an underlying state crime is required in a RICO indictment, as distinguished from the elements of the penal codes of the various states where acts of racketeering occurred." *United States v. Orena*, 32 F.3d 704, 714 (2d Cir. 1994) (internal quotation marks omitted). Other circuits have reached similar conclusions. *See, e.g.*, *United States v. Frumento*, 563 F.2d 1083, 1087 (3rd Cir. 1977) (the "gravamen" of a RICO charge "is a violation of federal law and reference to state law is necessary only to identify the type of unlawful activity in which the defendant intended to engage" (internal quotation marks omitted));

*United States v. Davenport*, No. 22-4660, 2025 WL 400720, at *2 (4th Cir. Feb. 5, 2025) (per curiam) (VICAR indictment "is not deficient for failing to list each element of the predicate under state law"). And at least two district courts in this circuit have followed suit. *See United States v. Garcia*, No. 11–cr–68–EJL, 2012 WL 6623984, at *8 (D. Idaho Dec. 19, 2012) ("[M]ost courts addressing the question have concluded that a more generic description in the indictment is sufficient—notwithstanding that the elements of the predicate acts must be proved at trial."); *United States v. York*, 1:16-cr-00069-LJO-SKO-11 2017 WL 3581711, at *2 (E.D. Cal. Aug. 18, 2017) (noting only the "essential elements" of the VICAR offense are needed in the indictment, not elements of the predicate offense). We are persuaded by the reasoning of our sister circuits in holding that where a VICAR indictment tracks the VICAR statute's language, it sufficiently informs the defendant of his charge, even if it does not also enumerate the elements of the predicate state law crime, and so hold.

Defendants' arguments to the contrary are unavailing. As a general matter, Defendants rely primarily on caselaw and circuit materials discussing the sufficiency of jury instructions and what the Government must prove at trial, not the sufficiency of an indictment. *See* Ninth Circuit Manual of Model Criminal Jury Instructions § 18.8 (2022 ed., updated June 2024); *United States v. Adkins*, 883 F.3d 1207, 1211 (9th Cir. 2018). But as the Defendants' own cited case explains, the requirements for an indictment are not the same as for jury instructions or the Government's ultimate case. *See United States v. Carrillo*, 229 F.3d 177, 183 (2d Cir. 2000) ("The[] purposes and requirements of the indictment are irrelevant to whether the government must prove, and the jury must be charged on, the elements of the

offense."). This follows from the difference in purpose between an indictment and jury instructions. The requirements for jury instructions, then, cannot be imported to the indictment context in these circumstances.

Because Counts 2 and 3 sufficiently set out the essential elements of a VICAR crime, we affirm the district court's denial of dismissal of those Counts.[2]

## II.  Pribbernow's Testimony

"We review a district court's evidentiary rulings under the deferential abuse of discretion standard." *United States v. Saini*, 23 F.4th 1155, 1160 (9th Cir. 2022). De novo review only applies if that exclusion precludes presentation of a defense. *United States v. Ross*, 206 F.3d 896, 898–99 (9th Cir. 2000).

Dencklau argues that the district court erred in three evidentiary rulings related to coconspirator Tiler Pribbernow, another GJMC associate: (1) excluding evidence of Pribbernow's reputation for violence under Rule 404, (2) excluding evidence of Pribbenow's past violent acts under Rules 403 and 404, and (3) barring Dencklau's re-cross-examination of Pribbernow. Each of those arguments fails.

First, the district court did not err in excluding evidence of Pribbernow's reputation for violence because Dencklau's proffered evidence was inadmissible propensity evidence pursuant to Rule 404. Dencklau nominally argues that Rule 404(a) permits evidence as to a witness's reputation for

---

[2] Given the grand jury's special findings that appellants "[i]ntentionally killed" Huggins and "[i]ntentionally" committed acts resulting in death, we also reject appellants' claim that the indictment misstated the mens rea for VICAR murder.

violence "[w]hen reputation for violence is probative of a defendant's defense." But Dencklau's cited case dealt with Rule 404(a)'s exception for evidence as to victims, not witnesses; Rule 404(a)'s exception for witnesses is narrower and inapplicable here. *See* Fed. R. Evid. 404(a); *see also United States v. Keiser*, 57 F.3d 847, 853–54 (9th Cir. 1995). Beyond general propositions, Dencklau offers no caselaw supporting a Sixth Amendment right to present this character evidence. Additionally, because Pribbernow testified that he had a reputation for violence and "could fight" prior to joining the GJMC, the jury was presented with substantial evidence of Pribbernow's reputation for violence. Given that he was otherwise able to impeach Pribbernow through a variety of other testimony and absent support in the exceptions to Rule 404's general prohibition or the Sixth Amendment, Dencklau's argument fails.

Second, the district court did not err in excluding evidence of Pribbernow's past violent acts. Dencklau argues that this proposed evidence was not meant to show Pribbernow's propensity for violence, as barred by Rule 404(b), but instead to discount elements of the conspiracy charges and to dispute Dencklau's role in the murder. Specifically, Dencklau claims that evidence of Pribbernow's past violent acts that predate his association with GJMC would rebut the Government's argument that GJMC was a violent organization and that Dencklau caused Pribbernow to engage in violence as part of the GJMC enterprise. Dencklau claims that this evidence was important because "[a] large part of the trial turned on the jury's view of the character of the GJMC and its members," and GJMC's alleged overall pattern of violence. Such evidence, however, would still go to Pribbernow's propensity for violence. *See United States v. Lynch*, 437 F.3d 902, 914–15 (9th Cir.

2006), *overruled on other grounds, United States v. Lucas*, 101 F.4th 1158 (9th Cir. 2024). Furthermore, Pribbernow testified that he had a reputation for violence prior to joining the GJMC and that he "sometimes" committed crimes that nobody in the GJMC told him to commit. Therefore, because the jury was already aware of Pribbernow's violent character through other testimony, the district court also reasonably excluded the proposed past-violent-acts evidence as substantially more prejudicial than probative pursuant to Rule 403, especially where the past conduct was not particularly relevant to the conduct at issue.

Third, the district court did not err in barring Dencklau from re-cross-examining Pribbernow about his military discharge. Dencklau argues that the Sixth Amendment required the district court to allow re-cross-examination because Pribbernow's military discharge was materially new information the Government elicited on redirect. While Dencklau is correct that the Sixth Amendment's Confrontation Clause may require district courts to allow re-cross-examination "where new matter is elicited on redirect examination," testimony is not "new matter" if it merely "expand[s] or elaborate[s] on the witness' previous testimony." *United States v. Baker*, 10 F.3d 1374, 1404–05 (9th Cir. 1993), *overruled on other grounds, United States v. Nordby*, 225 F.3d 1053 (9th Cir. 2000). Here, Dencklau had already raised Pribbernow's military discharge during cross-examination. Because Dencklau already addressed that topic, it was not a "new matter" for Confrontation Clause purposes. *United States v. Croft*, 124 F.3d 1109, 1121 (9th Cir. 1997). The district court, accordingly, did not err in barring re-cross-examination.

Because the district court's evidentiary rulings regarding Pribbernow were in accordance with the Rules and the Sixth Amendment, we reject Dencklau's claims.

## III. Expert Evidence Regarding Erickson's Mental Deficits

We review claims for exclusion of expert testimony for abuse of discretion. *Messick v. Novartis Pharms. Corp.*, 747 F.3d 1193, 1196 (9th Cir. 2014). Review on Fifth and Sixth Amendment presentation-of-defense grounds is de novo. *See Ross*, 206 F.3d at 898–99.

Erickson claims that the district court abused its discretion by excluding expert testimony as to his alleged mental deficits and that the exclusion violated his Fifth and Sixth Amendment right to present his defense. He offers three main arguments, each of which fails.

First, Erickson argues that the district court erred in barring the expert evidence pursuant to Rule 702's relevance prong because it applied the wrong standard for evaluating evidence as to diminished mental capacity. *See* Fed. R. Evid. 702(a) (expert evidence is admissible only if it "will help the trier of fact to understand the evidence or to determine a fact in issue"). In Erickson's view, the district court mistakenly focused only on whether the expert evidence "could show that Erickson 'was *incapable* of forming the specific intent required by the charged offense.'" He argues that instead, the district court should merely have evaluated whether the evidence would be helpful to the jury in determining "whether the defendant committed the offense with the required mental state." But this recounting is inaccurate. The district court, in its written opinion, recognized that under the limitations imposed by the Insanity Defense Reform Act, diminished capacity defenses are limited—only

evidence that "tends to negate the mens rea required for the crime charged" is admissible.  This was the appropriate standard for the district court to apply.  And, applied to the proposed expert evidence, the district court did not abuse its discretion in determining that evidence was not relevant pursuant to Rule 702.  At best, most of the evidence went to general cognitive impairments too abstracted from the relevant mens rea inquiry at hand to be relevant.

Second, Erickson argues that the district court erred in additionally barring the expert evidence on Rule 403 grounds because, in his view, the expert evidence was "highly probative" and not "unduly complex."  But, as the district court held, "[e]ven if the diminished capacity testimony had some relevance, its probative value would nevertheless be substantially outweighed by its potential to mislead the jury[.]"  Psychological and neuroscience evidence is particularly vulnerable to jury misunderstanding and misuse.  Where, as discussed above, the probative value of such evidence is limited, the risk of misleading the jury supports its exclusion under Rule 403.

Third, Erickson offers a partial Fifth and Sixth Amendment presentation-of-defense argument against the expert evidence's exclusion.  Erickson seems to argue that the exclusion of the expert evidence prevented him from offering a complete defense regarding his mental state, in violation of due process.  As a general matter, Erickson is correct that "the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (internal quotation marks omitted).  But a "valid state justification" may preclude introduction of certain evidence, including if it is not "competent" or "reliable."  *Id.*; *see also Clark v. Arizona*, 548 U.S. 735, 770 (2006) ("[T]he right to introduce

relevant evidence can be curtailed if there is a good reason for doing that.").

In determining whether the exclusion presents a constitutional problem, the court may consider "the probative value of the evidence on the central issue; its reliability; whether it is capable of evaluation by the trier of fact; whether it is the sole evidence on the issue or merely cumulative; and whether it constitutes a major part of the attempted defense." *United States v. Stever*, 603 F.3d 747, 756 (9th Cir. 2010) (quoting *Alcala v. Woodward*, 334 F.3d 862, 877 (9th Cir. 2003)). Here, the excluded evidence is of limited probative value and was likely not capable of quality evaluation by the jury. Its exclusion therefore was not a constitutional violation. *See Clark*, 548 U.S. at 770 (excluding evidence to avoid the "potential to mislead the jury" does not violate the Constitution (quoting *Holmes v. South Carolina*, 547 U.S. 319, 326 (2006))).

We accordingly affirm the district court's exclusion of the expert evidence as to Erickson's alleged mental incapacity.

## IV. Evidence on Purportedly Inflammatory Topics

We review the district court's evidentiary rulings for abuse of discretion but review de novo its interpretation of the Rules. *United States v. Boulware*, 384 F.3d 794, 800–01 (9th Cir. 2004). If "a party did not object to the district court's admission on Rule 403 grounds," we review for plain error. *United States v. Rizk*, 660 F.3d 1125, 1132 (9th Cir. 2011). Plain error in admitting evidence under Rule 403 is the "rare exception." *Id.* (quoting *United States v. Plunk*, 153 F.3d 1011, 1019 n.7 (9th Cir. 1998)).

Defendants argue that the district court erred by allowing argument and evidence related to the GJMC in three categories. First, Defendants argue that the Government's and Government witnesses' use of the word "gang" to describe the GJMC was unduly prejudicial and had minimal probative value because "[i]t offered no objective evidence relating to the club's purpose, structure, or activities." Second, Defendants argue that any discussion of a "culture of misogyny" in the GJMC "was not relevant to whether the enterprise was engaged in a pattern of racketeering activity" and instead "inflame[d] the jury against the GJMC members." Third, Defendants argue that prosecutors' use of race-based evidence to show the GJMC's cohesion was unduly prejudicial. Each of these claims fails on the deferential review afforded to the district court for its evidentiary rulings.

The district court determined that any "marginal undue or unfair prejudice" arising from the use of the word "gang" in the trial was outweighed by the probative value of the otherwise admissible evidence being heard in full as it related to describing the nature of the GJMC enterprise.[3] While Defendants cite to several cases where district courts barred the word "gang" from trial, the Government points to another case reaching the opposite conclusion and highlights that these different outcomes reflect the case-by-case nature of these evidentiary rulings. Though Defendants claim that the use of "gang" "may have influenced the jury to improperly impute knowledge of criminal acts to the defendants," they provide no evidence of their own to substantiate that claim. Instead, as the Government notes,

---

[3] The nature and existence of the enterprise was a central issue to the RICO conspiracy and the VICAR crimes.

that "the jury acquitted Hause and partially acquitted Erickson" suggests it closely considered the competing evidence.

Defendants' claim as to the evidence regarding GJMC's treatment of women fares no better. Unlike the Defendants' cited cases, here the treatment of women was a part of the Government's description of the nature of the enterprise, not just an impeachment of the defendants' character. Defendants cite *United States v. Hazelwood*, but the court there determined that the proffered evidence of misogyny would not "make it more likely that [the defendant] committed" the crime at issue. 979 F.3d 398, 408–12 (6th Cir. 2020). Similarly, in *United States v. Ham*, the court determined that the evidence of misogyny "had no relevance except possibly as impeachment evidence." 998 F.2d 1247, 1253 (4th Cir. 1993). By contrast, the way the GJMC treated women was part of the Government's case in proving the nature of the enterprise for RICO and VICAR purposes.

Defendants' argument as to the GJMC's racially exclusionary policies fails on similar grounds. Under plain error review, which the parties agree applies to this subclaim, reversal is warranted only if "(1) there was error; (2) it was plain; (3) it affected the defendant's substantial rights; and (4) viewed in the context of the entire trial, the impropriety seriously affected the fairness, integrity, or public reputation of judicial proceedings." *United States v. Alcantara-Castillo*, 788 F.3d 1186, 1190–91 (9th Cir. 2015) (internal quotation marks omitted). As a threshold matter, given the "inherently fact-specific nature of the Rule 403 balancing inquiry," *Rizk*, 660 F.3d at 1132 (citation omitted), it is difficult to say that the district court allowing the Government to use *some* evidence of GJMC's racially exclusionary policies was error, or that any such error was

plain. That the district court excluded some of the evidence as cumulative suggests it was closely monitoring the Rule 403 balance. As Defendants' own cited case recognizes, racially exclusionary policies can be relevant even where no race-based crime is at issue if "it tend[s] to show the uniformity of the . . . enterprise." *United States v. Bowman*, 302 F.3d 1228, 1239–40 (11th Cir. 2002). While the *Bowman* court determined the membership policy evidence there was cumulative and unfairly prejudicial, it ultimately declined to find error because the overwhelming evidence against the defendant prevented the error from affecting his substantial rights. *Id.* at 1240. The district court here, by contrast, determined that some evidence of racially exclusionary policies was more probative than prejudicial. But similarly to *Bowman*, that determination was not plainly erroneous, given the other, uncontested evidence of the GJMC's use of racist symbols and, more generally, the breadth of evidence as to the nature of the GJMC enterprise.

Because Defendants fail to show how the district court abused its discretion or plainly erred in any of these evidentiary rulings, and the rulings are similarly not error when considered cumulatively, we affirm the district court.

## V.   Comments About Defense Counsel

The parties agree that the district court's handling of the Government's question to a witness, and the witness's isolated response about defense counsel's veracity should be reviewed for plain error. And, under that deferential standard, the district court did not plainly err.

In brief, the alleged error at issue involved the Government and a key witness, Detective James Lawrence, implying that counsel for Erickson had lied when questioning Lawrence about calls Dencklau made after he

was robbed. At the time, neither defense counsel objected. Instead, weeks later, Erickson's counsel introduced a new call log exhibit purportedly showing that it was the witness who was incorrect about the calls, not defense counsel. Though the district court expressed concern that Erickson's counsel might have waited to introduce a group of new exhibits, including the call log, as a tactical move, it nonetheless allowed the alternative phone log into evidence.

The single, isolated comment by Lawrence, a witness, stating that defense counsel was lying about the phone calls survives plain error review. Defendants argue that an attack on defense counsel's truthfulness "undermines the defendant's right to a fair trial." To Defendants, this accusation by the Government had "far-reaching impact unless corrected by the judge." In the Government's view, such an isolated incident, remedied by the introduction of the alternative call log exhibit, does not warrant reversal, especially where defense counsel did not ask for the court to strike the testimony.

The Government has the better argument, as illustrated by its review of the Defendants' cited cases. In each of those cases, there were "multiple errors," a "combination" of misstatements and slander, or "extensive" improper comments. *United States v. Rodrigues*, 159 F.3d 439, 451 (9th Cir. 1998) ("combination"), *Bruno v. Rushen*, 721 F.2d 1193, 1195 (9th Cir. 1983) ("extensive"). For example, in *Rodrigues*, the Government misstated the applicable law and "slander[ed]" the defense counsel by claiming he "tried to deceive" the jury. 159 F.3d at 449–51. And, in *United States v. Sanchez*, "the prosecutor vouched for the Government's witnesses and denigrated the defense as a sham." 176 F.3d 1214, 1224 (9th Cir. 1999). By contrast, Defendants here highlight only a single comment that they themselves did not

object to in the moment.  Nor did the prosecutor "vouch" for the witness.  Absent further prosecutorial misconduct or instances of the Government calling defense counsel's truthfulness into question, it is unlikely the single question and comment "seriously affected the fairness, integrity, or public reputation of" the trial.  *Alcantara-Castillo*, 788 F.3d at 1190–91.  We thus reject the Defendants' claim as to that comment.

## VI.   Purpose Element of the VICAR Offenses

Dencklau and the Government agree that the district court's jury instruction on VICAR's purpose requirement should be reviewed for plain error.[4]  They also agree that the district court's instruction on VICAR purpose mirrored Model Instruction 8.154, but disagree on whether that model instruction accurately conveyed the VICAR purpose standard.[5]  "To prove VICAR purpose—that the murder was 'for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity,' 18 U.S.C. § 1959(a)—the 'gang or racketeering

---

[4] Erickson does not raise this claim.

[5] The district court provided the following instruction:

> With respect to the fourth element, the government must prove beyond a reasonable doubt that the defendant's purpose was to gain entrance to or to maintain or to increase position in the enterprise. It is not necessary for the government to prove that this motive was the sole purpose or even the primary purpose of the defendant in committing the charged crime. You need only find that enhancing his status in the Gypsy Joker Motorcycle Club was a substantial purpose of the defendant or that he committed the charged crime as an integral aspect of membership in the Gypsy Joker Motorcycle Club.

enterprise purpose does not have to be the only purpose or the main purpose of the murder or assault.  But it does have to be a substantial purpose.'"  *Manning*, 151 F.4th at 1149 (second quote from *Banks*, 514 F.3d at 969).

Dencklau primarily relies on *United States v. Banks*, which critiqued the use of qualifying phrases like "one of," "at least one of," or "at least in part" when describing enterprise-related purpose for VICAR liability.  514 F.3d at 964–70.  Dencklau attempts to read *Banks* to stand for the proposition that any qualifying language in a jury instruction can taint that instruction by potentially suggesting a lower burden to the jury.  The jury instruction in *Banks*, though, did not contain any language about the enterprise-related purpose being a "substantial," "integral," or "general" purpose for committing the predicate VICAR crime.  *Id.* at 969.  Such a broad reading of *Banks* has no basis in VICAR law or the facts of that case itself.  The district court's jury instruction in the instant case clearly communicated the required VICAR purpose—i.e., substantial, but not necessarily primary—and there was therefore no error.  We affirm the district court.

## VII.   Jury Instruction on Potential Punishment

The district court did not err by instructing the jury on the proper consideration of potential punishment faced by Defendants or cooperating witnesses.  The court reviews the "'language and formulation' of a jury instruction for abuse of discretion."  *United States v. Rodriguez*, 971 F.3d 1005, 1012 (9th Cir. 2020) (quoting *United States v. Cortes*, 757 F.3d 850, 857 (9th Cir. 2014)).  "Jury instructions must be evaluated as a whole, and in context, rather than in piecemeal," *id.* at 1012 (internal quotation marks omitted), to determine whether they "were misleading or inadequate

to guide the jury's deliberation," *United States v. Tuan Ngoc Luong*, 965 F.3d 973, 986 (9th Cir. 2020) (cleaned up).

Here, the parties all requested that the district judge instruct the jury with Ninth Circuit Model Criminal Instruction 7.4 (2010), which provides: "The punishment provided by law for a crime is for the court to decide. You may not consider a defendant's potential punishment in deciding whether the government has proved its case against the defendant beyond a reasonable doubt." Throughout the trial, the district court provided the following relevant instructions:

- It modified the model instruction to make clear that the Defendants were not facing the death penalty, given defense counsel's plan to cross-examine the cooperating witnesses about the threat of the death penalty at the time of their cooperation.[6]

---

[6] The district court gave the following modified preliminary instruction:

> The punishment provided by law for a crime is for the Court to decide. Four of the government's witnesses face the death penalty as a result of their participation in crimes related to this case. The punishment that these witnesses face is not necessarily the same punishment that the defendants will face, even if you find that they participated in the same crime. In fact, none of the defendants here is currently facing the death penalty. You may not consider punishment in deciding whether the government has proved its case against the defendant beyond a reasonable doubt.

The district court's final instruction mirrored the substance of this preliminary instruction.

- It gave another instruction in the middle of the trial, reminding the jury that sentencing was the judge's job, not theirs.

- It gave the model jury instruction on witness credibility, indicating the jury could consider "the witness's interest in the outcome of the case, if any, [and] the witness's bias or prejudice."

- It also made clear in its final jury instructions that the jury could and should consider the cooperating defendants' plea agreements and favorable treatment when evaluating their testimony.

The parties dispute whether these instructions constitute reversible error. Defendants first argue that the district court's instructions violated the general rule against instructing the jury about the Defendants' potential sentences, citing our decision in *United States v. Frank*, 956 F.2d 872, 879 (9th Cir. 1991) (explaining that "it is inappropriate for a jury to consider or be informed of the consequences of their verdict"). Discussing the rule in the context of insanity verdicts, we explained that the purpose of this rule is to ensure that the jury is focused on its role as factfinder and the evidence before it, not factors beyond the evidence. *See id.* However, three years later in *Shannon v. United States*, the Supreme Court clarified, again in the context of insanity verdicts, that "an instruction of some form" as to the consequences of a verdict "may be necessary under certain limited circumstances," making clear that there is no "absolute prohibition on instructing the jury with regard to the consequences of" a verdict. 512 U.S. 573, 587–88 (1994).

Viewing the entire set of the relevant jury instructions in light of the general rule's purpose—keeping the jury focused on its factfinding mission—the district court did not err in modifying the model jury instruction.  The totality of the district court's various instructions evinces an attempt to balance effectively communicating to the jury that they should view the cooperating witnesses' testimony through the lens of their plea agreements with the need to remind the jury that they should *not* consider the Defendants' potential sentences as part of their fact-finding role.  Taking a categorical approach in either direction would have entirely frustrated one of these goals.  Instead, the district court created guardrails around both key areas: it allowed for cross-examination of the cooperating witnesses and made clear that the jury should bear the plea deals in mind when evaluating those witnesses, while also ensuring that the evaluation of the witnesses' sentences did not create undue fixation on the Defendants' potential sentences.  The totality of the instructions illustrates the district court's good faith attempt to keep the jury in their assigned lane: focused on the facts, the evidence, and the witnesses' credibility.  This approach aligns with *Frank*'s explanation of the purpose behind the general rule against instructions related to potential punishment and did not constitute an abuse of discretion.

We accordingly reject Defendants' challenges to these jury instructions.  We note, however, that this holding does not alter the general prohibition against informing the jury of sentencing consequences, as outlined in *Frank* and *Shannon*, outside of this particular, limited circumstance.

## VIII.   Erickson's Eighth Amendment Claim

Erickson challenges his mandatory life sentence as a violation of the Eighth Amendment.  But our precedent forecloses any argument that a mandatory sentence of life without the possibility of parole violates the Eighth Amendment.  In *United States v. LaFleur*, we rejected an Eighth Amendment challenge to a mandatory minimum life sentence for murder, ruling that an individual assessment was not necessary to determine "the appropriateness of a life sentence," as it is for a capital sentence.  971 F.2d 200, 211 (9th Cir. 1991).  We made clear that "a mandatory life sentence for murder does not constitute cruel and unusual punishment."  *Id.*   That conclusion followed a Supreme Court case from the same year similarly holding that individualized assessments were not constitutionally necessary outside the capital context.  *See Harmelin v. Michigan*, 501 U.S. 957, 994–96 (1991) (refusing to extend the "individualized capital sentencing doctrine" to mandatory life in prison without parole sentences for cocaine possession).

Erikson does not dispute this precedent.  Indeed, Erickson's counsel recognized that they were asking the district court "to extend the law beyond where it is now." But this panel cannot contravene prior Circuit precedent, nor that of the Supreme Court.  Though, as the sentencing judge recognized, the mandatory minimum would be beyond what the court would otherwise have imposed when considering Erickson's role in the conspiracy, precedent forecloses a *constitutional* challenge to the mandatory minimum sentence.  We therefore affirm the district court's sentence.

## CONCLUSION

The district court did not err in its rulings on any of the constitutional or Rules-based grounds Defendants raise. We accordingly **AFFIRM** their convictions and sentences.